ERIC RINDERER *et al.*, Plaintiffs-Appellees, *v.* LEONARD KEEVEN,
Defendant-Appellant.

Fifth District   No. 79-544

Opinion filed October 28, 1980.

KARNS, J., dissenting.

Robert F. Kaucher, of Kaucher, Collins & Ligman, of Highland, for appellant.

J. William Lucco, of Mudge, Riley & Lucco, of Edwardsville, for appellees.

Mr. PRESIDING JUSTICE JONES delivered the opinion of the court:

Plaintiffs, Eric and Sandra Rinderer, brought suit for a declaratory judgment and for preliminary and permanent injunctions against defendant, Leonard Keeven, who, they alleged, was obstructing their use of two implied easements over his property. Defendant denied the existence of the implied easements, claiming alternatively that no implied easements had been created and that if any easement had existed, it had been extinguished by an agreement between defendant and plaintiffs' predecessor in title that was known and acceptable to plaintiffs prior to their purchase of the allegedly dominant tract. Having earlier granted plaintiffs a preliminary injunction for the pendency of the lawsuit, the trial court ruled after hearing all the evidence that plaintiffs owned the two easements and permanently enjoined defendant from obstructing them. From that order defendant appeals.

At one time both plaintiffs' and defendant's properties were part of a farm owned by Nelson and Leona Walter, who began to reside on it about 1946 or 1947. After Nelson Walter's death in 1953 Leona Walter continued to reside in the dwelling on the property. Later, in 1958, she moved into a trailer located on the farm and leased the dwelling to a son, Melvin Walter, and his wife, Rita. In 1961 she conveyed to Melvin and Rita Walter a parcel containing the dwelling. Southwest of the dwelling was a building that Nelson and Leona Walter had leased to commercial lessees for use as a warehouse. The northern part of that building was included in the conveyance to Melvin and Rita Walter, apparently for use as a garage, but the southern part of the building was not included in the conveyance. Leona Walter continued to receive the rents from the warehouse, that is, the southern part of the building, until 1965, when she conveyed to Melvin and Rita Walter another parcel containing the southern part of the building. The second parcel adjoined the property earlier conveyed to Melvin and Rita Walter. After the conveyance in 1965 Melvin Walter received and retained the warehouse rents. After Leona Walter's death in 1976, another son serving as executor of her estate sold what appears to be the remainder of the farm to defendant, a land developer. Although defendant agreed to buy the property in the fall of 1976 and staked out the location of a two-story apartment building at about the same time, he did not actually take title until April 6, 1977, and, because of winter weather, did not begin excavation for the apartment building until the spring of 1977. A few months later, on August 3, 1977, Melvin and Rita Walter conveyed to plaintiffs the property they had acquired from Leona Walter in 1961 and in 1965.

Plaintiffs' and defendant's properties abut, plaintiffs' lying to the east

of defendant's. The northern boundary of both plaintiffs' and defendant's properties is the Highland-Carlyle Road, also known as St. Rose Road and as Broadway. Plaintiffs' property bears a Broadway address. On plaintiffs' property, however, there is no existing access to Broadway, that is, the Highland-Carlyle Road. When Nelson and Leona Walter owned the property, they used for ingress to and egress from their residence either of two principal routes over their farm, both topped with cinder and wide enough to accommodate a single vehicle. One route ran on flat terrain in an east-west direction. That route led from their dwelling over what is now defendant's property west to Oak Street, which runs north and south and intersects with the Highland-Carlyle Road. The other route ran in a north-south direction. This route led from the Walters' dwelling over the northeast portion of what is now defendant's property north to the Highland-Carlyle Road. Unlike the east-west way, the north-south route was not over flat terrain. The grade of the north-south way was variously described as "a slope" by defendant and as "a steep hill" by Warren Walter, the son who had served as executor of his mother's estate and had sold the property to defendant. Warren Walter indicated that at about the time he had had his own house built to the west of that of his parents in 1951, his parents began to use the east-west way to reach their residence although they had used the north-south way for that purpose prior to that time. After that time they apparently used both ways concurrently, though possibly avoiding the north-south route in times of inclement weather. According to Melvin Walter, the north-south route to the Highland-Carlyle Road had become impassable and had been abandoned by the time of severance in 1961, so that the only means of ingress to and egress from the residence at the time of severance was the east-west roadway. After the severance in 1961 Melvin and Rita Walter used the east-west way in order to reach their residence as they had done while they leased the property between 1958 and 1961. They continued to use the way after defendant's acquisition of the adjoining property and during the construction of the apartment building, to the extent that it was possible to do so. The east-west way is one of the easements the trial court found that the plaintiffs own.

The other easement the trial court found that plaintiffs own is one which runs north-south along the west side of the warehouse. Plaintiffs' property line extends only about one foot west of the warehouse, which measures, according to Eric Rinderer's testimony, 30 feet wide by 100 feet long. At the rear of the warehouse, that is, on the south side of it, is a loading dock. During ownership of the warehouse not only by Nelson and Leona Walter but also by Melvin Walter, both before and after defendant's purchase of the adjoining property, commercial vehicles of lessees of the warehouse used an ungraded, north-south cinder roadway

along the west side of the building in order to reach the loading dock. Melvin Walter testified that commercial vehicles had never approached the loading dock along the east side of the building and explained that "a fairly steep hill" makes it possible to get a car through but "[t]hat would be about the extent of it." Along the east side of the warehouse are a shed, a tree and a grape arbor. On that property line to the south of the warehouse another property owner has erected a fence. Melvin Walter indicated that it would be possible to get into the southern part of the building from the northern part for purposes of loading.

Near the northwest corner of this building, which serves as both warehouse and garage, the north-south way along the west side of the building intersects with the east-west roadway that provides access to the residence. This north-south way along the warehouse appears to be the southern portion of the north-south roadway that at one time provided direct access from the farm to the Highland-Carlyle Road. Warren Walter testified that he "imagine[d]" that after his house was built in 1951 commercial vehicles reached the north-south way along the west side of the warehouse by using both the east-west roadway as well as the north-south one out to the Highland-Carlyle Road. Melvin Walter indicated that all the commercial vehicles that came across what is now defendant's property in order to reach the warehouse between 1961, when Melvin Walter bought the property, and 1977, when he sold it to plaintiffs, came across the east-west roadway. This witness also indicated that the warehouse was leased "continually" by both his mother and himself. Defendant indicated that after he purchased the property, commercial vehicles used, in addition to the east-west roadway, alternative routes over his property in order to reach the warehouse. Commercial traffic to the warehouse apparently ceased a few months after plaintiffs purchased the property.

Defendant testified that just prior to purchasing the property, for the purpose of locating boundaries, he had walked with Warren Walter around what are now Lots 1 and 2 of the property, that is, the northernmost lots of defendant's property where the disputed easements are located. He indicated that he had seen part, if not all, of the east-west cinder surface. He testified to his familiarity, prior to purchasing the property, with the use by commercial vehicles of the north-south road along the west side of the warehouse in order to reach the southern part of that building. He testified as well to his familiarity with the property for about 10 years prior to his purchase of it and to having had occasion to be on the property prior to the purchase. We note that there are no express easements with respect to either of these two roadways in any of the pertinent deeds.

A registered engineer and registered land surveyor, Jim Sherbut,

testified that he "believe[d] it was sometime in 1977" Eric Rinderer asked him to furnish a "proposal as to the feasibility of constructing a driveway from the Rinderer property northward to the St. Rose Road" which would provide access to both the residence and the warehouse. He proposed a driveway located in the northwest corner of the property because of the incline of not only St. Rose Road but also the plaintiffs' property. He described the incline of plaintiffs' property as "a moderately steep grade" and described the driveway proposed as "feasible" and "reasonably safe," given the incline of the property and the highway. His estimated cost for a 16-foot crushed stone asphalt driveway was $6,002.73, and for a concrete driveway of the same size, $6,998.42.

During defendant's construction of the apartment building and of a parking lot immediately to the south of the apartment building, both of which lie in a generally east-west direction, Melvin Walter found it difficult at times to gain access to his property. It is undisputed that the east-west cinder roadway was, except for a small portion at either end, obliterated by defendant's construction upon his property. During cross-examination by defendant's attorney, Melvin Walter acknowledged having "[s]ome" objection to the obliteration. Asked, "Did you work out something with Mr. Keeven on that?" he answered, "We worked it out, yes." Asked further whether there was an oral agreement, Melvin Walter responded, "I spoke with him at my brother's house." Following an objection and its disposition, the following colloquy was had:

"Q. [Attorney for defendant]: Mr. Walter, back to you again. Whether in some fashion you and Mr. Keeven reached an understanding about that east-west roadway after he bought the property and he had come onto it and it was excavated and the roadway was destroyed, did you and he work out any sort of arrangement concerning your passage to and from your property across that?

A. [Melvin Walter]: The first time I spoke to him he hadn't begun any construction, and I seen [sic] him at my brother's garage and asked him how am I going to get back and forth because he now owned the property in between; and he said to go ahead and use it. We did, and later on when it was excavated, then I went through the bottom portion of his land and out to—was it Oak or Ash Street that runs out through there—and other than that, I really don't recall if we had any other agreements on that or not, because I had planned to sell it and I wasn't particularly concerned about it really.

Q. You had no objections—You accepted it and used another route when he had closed off the road?

A. Well, I objected a bit but I came down through the other part of his property and onto the other street.

Q. You accepted it and used another route, did you not?

* * *

A. Yes.

Q. Mr. Walter, did you also having [*sic*] in mind the fact that you were going to sell the property at that time, make any arrangement with Mr. Keeven concerning your purchaser that you would sell the property to about the use of passing over that piece of property?

A. Yes, I did.

Q. Could you tell the Court what that was?

A. Mr. Rinderer and I talked to Mr. Keeven on the property one evening about how he would have access to his property.

Q. Uh-huh.

A. And it was stated that he could use that for a period of a year to go through there where his parking lot was. At that point he would have to work out some other arrangement, and I wasn't in on that.

Q. But you participated to the point of taking him to Mr. Keeven, and you and Mr. Keeven and he worked out apparently an agreement that he could use that for a year, was that your understanding.

A. That's what I understand, yes."

Later, still during cross-examination, after defendant's attorney inquired again whether the witness had found an alternate route, this exchange followed:

"A. I asked him how long it would be tore [*sic*] up because it was quite an inconvenience when the rains hit and there was mud through that area, and he assured me it would be fixed up and passable again.

Q. And you found an alternate route to get in and out?

A. For about three weeks or so, yes.

Q. When you did reuse it, you used another area further south?

A. Right. The front end was then moved to the south.

* * *

Q. Toward the south part of the parking lot?

A. That's right.

* * *

Q. And at the time you sold it to Mr. Rinderer is when you took him to Mr. Keeven and said, 'Here it is; work it out,' right? Is that the effect of what you did?

A. He had earnest money down on the property. He hadn't taken possession yet but we had talked to him prior to taking possession.

Q. And you took him to Mr. Keeven and you said, 'Here it is; work it out,' and to the best of your knowledge they reached an agreement where Mr. Rinderer could use it for a year?

A. That was the last I heard of it, yes—a year or until he had another road access put in.

Q. And that was agreeable with you, was it not?

A. I had no interest in it at that point.

Q. You had no objection to it, okay."

On direct examination the witness had testified that he had never entered a written agreement to stop using the east-west roadway. On redirect examination he testified that he didn't "recall any agreement about stopping coming across there," that he had never stopped coming across, that he had modified his route slightly in order to get through and that when the way became nearly impassable because of mud, he spoke to defendant about the situation and received assurance from him that it was temporary, a matter of a few weeks.

Defendant described the conversation with Melvin Walter about the use of the roadway as follows:

"The conversation was that he was going to sell the property and build a house, tear the old long shed down and use that for lumber in the house, and at that time when he sold the house he would bring the new buyer over, whoever was purchaser, prospective purchaser, and then at that time we would discuss the roadway and I would explain it to the new buyer as I did at that time with the four of us, Melvin Walter, Eric Rinderer, myself, and my son, Ken Keeven who represented the Melvin Walters [as their real estate agent in the sale to plaintiffs]."

Defendant indicated that he had discussed the matter of access with the realtor, Kenneth Keeven, prior to the sale to plaintiffs "because Melvin Walter said I could make it all with the new buyer." When Eric Rinderer was asked, "Did you ever have any notice that Mr. Keeven and Melvin Walter had ever had an agreement concerning the right to come across that property?" he responded, "On the contrary."

When plaintiffs first viewed the Walters' property, the east-west roadway was, as indicated above, no longer visible, most of it having fallen into the excavation for the apartment building, according to the testimony of Warren and Melvin Walter and defendant. According to the testimony of Eric Rinderer, when plaintiffs first saw the property, the parking lot had been generally outlined and had been filled in with rock though it had not yet been topped with asphalt. Eric Rinderer said that he had visited the property five times before purchasing it and on two of

those occasions discussed the matter of access to the property. The first of the two conversations occurred during plaintiffs' second visit to the property and was, he said, initiated by Melvin Walter. The plaintiff testified as follows with regard to Melvin Walter's statements concerning access to the property during that first conversation:

> "Mr. Walter said—and I can't say this is a word-for-word quote but close. He said he had had a little bit of a problem coming through here because of construction but that there was an easement and the legal way to and from his home was from approximately this area on El-Kay Court [a 50-foot wide street which leads to Oak Street to the west and lies within the western boundary of the subdivision, called El-Kay Villa Subdivision, that defendant developed out of Leona Walter's property] * * * to his yard."

The second of the two conversations occurred during plaintiffs' third visit to the property. He said he suggested it himself when he saw defendant out on his own property. During the conversation Melvin Walter was present. Plaintiff described the topic of the conversation not as a discussion of access but as a discussion of "what [defendant's] thoughts were about access to the property." By this distinction, he explained, he meant that he knew where the access was—"Mr. Walter had pointed out to me where the access was"—but that he felt some vagueness about the situation, that possibly there was a difference of opinion.

Plaintiff denied ever having requested written permission from defendant in order to pass over the property; he explained that he "didn't need any permission." He said he did request "that Mr. Keeven put in writing his thoughts about the access" and added,

> "I didn't tell him what needed to be on it. I didn't ask him, and I did insist to his son Kenneth that I wanted something from Mr. Keeven in writing expressing himself regarding that access, but not permission. I did not request permission."

Plaintiff said that he had wanted defendant's written statement at the time of closing and considered it a "condition" of the sale without which he would not have purchased the property. Apparently immediately after closing, Kenneth Keeven handed to Eric Rinderer the following writing, signed by Leonard Keeven and bearing the date of closing, August 3, 1977:

> "Eric Rinderer has permission to pass over the northern ten feet of Lot #2 El Kay Villa Subdivision, Highland, Illinois, for residential access purposes only.
>
> This permission will expire August 3, 1978 or at a time when he constructs his own driveway from Broadway, whichever occurs first."

Asked on cross-examination the purpose of obtaining from defendant a

written statement, the plaintiff answered, "I wanted to know whether or not I had to file a lawsuit." Plaintiff said, "* * * I suspected that I may [*sic*] have some sort of a legal problem with him and I wanted to know exactly where I stood should that problem develop, which it did." He stated that he had "bought and sold property before on occasion and I'm familiar with looking after things like that—I realized there may [*sic*] be a legal problem arising as to the access of [*sic*] this property because Mr. Keeven, although he didn't say so, seemed a bit vague as to whether he was going to allow people to come across there." On redirect examination he explained further:

"A. I was fairly certain that if I insisted that Mr. Keeven put something in writing that he would say definitely one way or the other whether he intended to let people cross his property to get to the home we bought, and if he gave me a piece of paper that stated in writing that he would not, then I was quite certain that I would probably have to take some sort of legal action to clear the matter up, which is exactly what we are doing."

Earlier on cross-examination the following exchange had occurred:

"Q. When [Mr. Keeven] did put it in writing and delivered it to you, that was satisfactory to you, wasn't it?

A. Yes.

Q. You accepted it, did you not? You accepted the title; you accepted the paper, and paid your money?

A. We didn't accept the contents, but the document was acceptable because it told me where Mr. Keeven stood.

Q. You—

A. We paid our money before we got that document."

The plaintiff later stated that after closing, while at Kenneth Keeven's office, he "glanced at [defendant's written statement] to make sure it was generally what I asked for and then left," taking it with the other documents. He said that he "didn't really pay much attention to it until near the date [defendant] had on there, until the time he was going to stop allowing us to use it."

The plaintiff further testified that defendant had offered to cut through the embankment on the Rinderers' property out to the Highland-Carlyle Road. Asked what defendant had told him "about a driveway," plaintiff answered,

"What he said—and Mr. Keeven didn't say that I had to put in a driveway or that he wouldn't in his mind grant access or whatever you want to call it, but what he did say was that if I wished to build a driveway up the front, he had a bulldozer there working or would have shortly and needed some fill dirt around his apartment building and parking lot. So what he offered to do was to make a

cut through that embankment for me. That's all. He didn't offer to build the driveway or anything. What he offered to do is make the cut and he could use all the dirt and to use it for fill dirt. I said I didn't know if I was interested in that."

Later plaintiff stated,

"I indicated to Mr. Keeven on several occasions that we weren't going to build the driveway. He had asked us in various contexts about building a driveway, and I told him I wasn't building a driveway, that I would look into the feasibility of building one but I didn't have any intention of building one."

Kenneth Keeven, the only witness to testify for the defendant other than Leonard Keeven himself, stated that the first time he was with Mr. Rinderer "at a showing," he had pointed out the boundary lines of the property to him and had told him with respect to access that "he would have to provide his own access to the property. It fronts on Broadway in Highland, and I told him that that would be the case." Asked if Mr. Rinderer had responded to that, the witness answered,

"Yes, sir. He asked if I would approach my father or if we could approach him who owned the property adjacent to it and get a license to use that for a time until he could get his own driveway put in."

Kenneth Keeven testified further to a conversation that had taken place between Eric Rinderer, his father and Melvin Walter. Excluding any statements made by Melvin Walter because of a hearsay objection, Kenneth Keeven described on direct examination the contents of the conversation as follows:

"Mr. Rinderer in talking with my father, they were discussing the possibility of putting a driveway up from Broadway, as I mentioned before. I remember my father offered to cut it for him at no expense to him only if he would do it while he had the caterpillar there. It was in conversation about construction later on, not at that conversation, Mr. Rinderer said no, he would put his own in at a later date, but he insisted or required that I would get written permission from Leonard Keeven, my father, to use that access over his parking lot for one year to give him sufficient time to get his own driveway in."

On cross-examination the witness testified that Eric Rinderer "[a]bsolutely" turned down defendant's offer with regard to the driveway. Asked, "And [Eric Rinderer] said, 'No, I'd rather cut my own driveway down there'?" the witness answered, "That's what he told us. It's kind of hard to believe that, isn't it?."

Testifying in his own behalf, defendant gave the following account of the conversation he had had with Eric Rinderer, at which Melvin

Walter was present, when he learned that plaintiff was to buy the property:

"He came over and asked about the roadway, about the access to the property, and I told him that I would be happy—we had a Cat coming back in the next week or two to finish up on the final grading, the parking lot, and the necessary excavating and I'd be happy to cut a road down to the St. Rose Road for him. There was going to be a private parking lot and was going to this [Lot] No. 2 [immediately south of Lot No. 1, which is the northernmost lot of the subdivision] which would be a play area for the tenants that would hopefully be built there. It had to be a private area so we would not have through traffic going through that parking lot. We talked back and forth and talked about a few things, and he said, 'I will let your son know what I have decided.' I would say approximately a week or two later my son told me he asked if he could come through for one year. That would give him sufficient time to build a driveway. So when my son got ready to close the deal out, he said Mr. Rinderer wanted to close out but he said, 'I need that paper. Can you get that paper for me, that he has a right to use it for a year?' "

With respect to Eric Rinderer's construction of a driveway, defendant said,

"After the conversation he told me personally hisself [*sic*] one time when he came out there to visit his property or for some reason to do something out there that he decided he would wait and dig his own driveway in at his convenience due to weather; he'd do it when he wanted to do it."

Defendant was uncertain precisely when Eric Rinderer made that statement but thought it was around the time of closing:

"I can't tell you exactly when it was, but I knew by his conversation he received [defendant's written statement] and I knew by his conversation that he wanted a year, which my son already told me he wanted a year so he could cut his own driveway and get his own access in there as was told to him in our meeting of the four."

Later defendant testified,

"As I stated earlier, sometime around that time [Eric Rinderer] told me he decided to come through there for a year because he did not want to cut the road in there then. He was going to cut it in at a later date because of the weather and some other things. I don't even know what it was, finances or he wanted to get his house under construction. He had some reason why he didn't want to do it right then. So I knew at that point—over and above my son telling him he had this agreement, he told me he'd get it done

within a year. He'd do it. That's the reason it was wrote [*sic*] that way, and he agreed to it."

Asked on cross-examination the reasons Eric Rinderer gave for not wanting defendant to build the "roadway," defendant answered,

"His main reason was the weather at that time of the year. He wouldn't get it done. If he had one year, as I testified, he could get it done if he could come through my property for one year, which I agreed to."

There followed:

"Q. [Attorney for plaintiffs]: Now he didn't say anything about his house being under construction and he couldn't afford to do it at that time?

A. Yes.

Q. Do you recollect him saying precisely those words?

A. On different occasions, yes. On different occasions he'd come over and talk for a minute or two. This is what came out in the conversation around that letter, yes."

Defendant indicated that he had not been aware of any claim of right plaintiffs had to pass over his property other than the permission he had given them in his written statement. He indicated too that Eric Rinderer never at any time before the end of July of 1978 made any claim that he could pass over defendant's property for any other reason than that defendant had given him permission to do so. He testified that the first time he had heard about a claim of easement from Eric Rinderer was "within a week of the expiration of that permission that I gave him in writing."

In an attempt to impeach the credibility of defendant, who stated at trial that his son had given defendant's written statement to Eric Rinderer, it was brought out that seven times during the taking of his deposition, defendant had stated unequivocally that he had handed the written statement to Eric Rinderer himself. Immediately upon returning to his apartment after the taking of the deposition, he said, he called his attorney and advised him of his error in this regard. Defendant's counsel then apparently notified plaintiffs' counsel of defendant's error and his correction.

On or about August 4, 1978, defendant caused to be erected along part of the eastern boundary of the subdivision a six-foot wooden fence, which effectively blocked access to both the residence and the warehouse on plaintiffs' property. On August 15, 1978, plaintiffs instituted this cause of action.

In a carefully and thoroughly prepared order the trial court, for its findings of fact and statements of law, stated *inter alia* that plaintiffs owned the two easements, that the easements were created by impli-

cation in 1961 and in 1965 by Leona Walter in favor of Melvin and Rita Walter, that the requisite elements for the creation of an implied easement were proved by plaintiffs as to each of the two easements, and that the easements passed to plaintiffs from Melvin and Rita Walter on August 3, 1977. The trial court stated further in the order that "neither Melvin Walter nor Rita Walter nor plaintiffs abandoned the easements," that plaintiffs by receiving the written statement of defendant, which provided for passage over his property for one year or until plaintiffs had constructed a driveway, "never acquiesced in the limiting or restricting of the easements * * * and, that regardless, any such license sought by the owner of an easement does not divest the easement owner of the easement" and that "Melvin Walter and defendant never entered into an agreement extinguishing the easements." The trial court permanently enjoined defendant from obstructing the plaintiffs' easements in any way and ordered defendant to pay plaintiffs $266.25 in court costs, which included a "reporting fee" of $169.25 and witness fees of $56.

On appeal defendant raises four issues, which we set forth as they appear in his brief.

"A. Whether there was an implied roadway created across defendant's land when plaintiff's preceding titleholder acquired the claimed dominant parcel of land.

B. Whether such easement, (assuming it was created), was extinguished or abandoned by plaintiff's predecessor in title, or by plaintiff.

C. Assuming for argument that an easement was created, and not extinguished or abandoned[,] whether plaintiff is estopped to claim an easement by accepting *and* using a terminable license over different land, and guilty of laches, by allowing one year to elapse before doing *any thing* to claim an easement, or to enforce such claim.

D. Whether the trial court awarded proper court costs in awarding a 'reporting fee' without any record of same, and witness fees without any record of same."

During oral argument plaintiffs conceded the issue concerning the award of costs.

■■ For an easement to arise by implication three conditions must be satisfied: (1) the dominant and servient estates must have been owned by a common grantor prior to severance of title; (2) the use prior to severance of title must have been apparent, obvious, continuous and manifestly permanent; (3) the easement must be essential to the beneficial enjoyment of the dominant estate. (*Miller v. Schmitz* (1980), 80 Ill. App. 3d 911, 400 N.E.2d 488.) Defendant maintains that of the three requisite conditions plaintiffs have shown but one to have been satisfied,

that of common ownership. He questions both the permanency and the necessity of the uses.

With respect to permanency of the uses he suggests:

"[W]hile it is true that before the separation occurred, there was a long continued and obvious use, it would seem that the element of permanency may be missing in that it must be considered that the claimed dominant and claimed servient owners were mother and son. The mother still owning the servient parcel and the son owning the dominant parcel. The family relationship probably was intended to create a license, without intention of creating a permanent road."

As defendant himself points out, whether an easement by implication has been created must be determined as of the time of the severance. (*VanPatten v. Loof* (1932), 349 Ill. 483, 182 N.E. 628.) In the instant case at the time of severance in 1961 the east-west way was the only means of access to the residence, the relatively steep north-south way to the Highland-Carlyle Road having become impassable, according to the testimony of Melvin Walter. We note that defendant testified that he remembered "the north and south being used in the last ten years that [Melvin and Rita Walter] used the property" and that he had used it himself "on a number of occasions." However, in his brief he states as a fact, "Sometime prior to 1958 when Melvin Walter returned to live in the home the north/south road was abandoned and became impassable." At the time of severance of the second parcel in 1965 the north-south way along the west side of the warehouse was the only means used by commercial vehicles in order to reach the loading dock. The east-west way was graded and both ways were topped with cinder. Both had been used continuously for a long time. Under such circumstances their use at the time of severance may be said to have been manifestly permanent.

With regard to the requirement of essentiality, defendant contends that Eric Rinderer has "a 'reasonably safe' and 'feasible' exit by his own engineers [*sic*] testimony, across his own land into a public highway upon which his property abuts." Relying heavily on *Wetmore v. Ladies of Loretto* (1966), 73 Ill. App. 2d 454, 220 N.E.2d 491, where the court found the requirement of necessity not to have been satisfied, he argues,

"The *Wetmore* case determines, as is the situation we have here, that the claimed dominant parcel had direct access to a public road and that under such circumstances an easement by implication was not to be sanctioned. That was true even though [*sic*] the easement claimant would have to travel almost twice as far to get [*sic*] a public road over his own land compared to the use of the claimed easement."

In *Wetmore* the party claiming that an easement had arisen by impli-

cation had sometime earlier acquired property with an express easement to the east over the seller's property. Later, the same buyer obtained from the same seller, the common owner of the dominant and servient estates, more property to the west of the original acquisition. Still later, the seller contended that the buyer had improperly increased the use of the express easement by using it for access to the subsequent acquisition and sought injunction. The buyer, in turn, claimed that an easement for the use of the subsequent acquisition had arisen by implication over the roadway which the express easement described. A factor in the court's finding that there was no necessity for an easement by implication—and a fact defendant neglects to mention—was the buyer's representation to the seller at the time of the sale that the purpose of acquiring the additional property to the west was, at least in part, to obtain another means of access to its property, that is, the public road on the west. In the instant case, of course, no such representation was made.

■■ ■ It is well established that one who claims an easement by implication need not show absolute necessity in order to prevail; it is sufficient that such an easement be "reasonable, highly convenient and beneficial to the dominant estate." (*People ex rel. Helgeson v. Hackler* (1961), 21 Ill. 2d 267, 271, 171 N.E.2d 599, 602.) Where alternative means of access to property are available without resort to passage over the lands of another and the use of such alternate means does not cause an unreasonable burden, courts should exercise "due continence in implying and imposing a burden over the lands of another." (*Wetmore*, 73 Ill. App. 2d 454, 463, 220 N.E.2d 491, 495.) The determination of the requirement that the use of an easement must be highly beneficial turns on the particular facts of each case. (*Wetmore*.) On review a court will not disturb the findings of a trial court as to proof of the conditions of an implied easement unless they are against the manifest weight of the evidence. *Neely v. Coffey* (1979), 76 Ill. App. 3d 37, 394 N.E.2d 766.

■■ Although it is possible for plaintiffs to construct a driveway in the northwest corner of their property, the cost of constructing a "reasonably safe" and serviceable driveway upon property with an incline as steep as that found on plaintiffs' was, sometime around 1977, over $6,000. The cost of such a driveway at the time of severance in 1961 was not known. The trial court correctly observed that the considerable expense of creating "feasible" access from the Highland-Carlyle Road to plaintiffs' property supports the finding that the easement running east and west through defendant's parking lot was "highly convenient and essential" to plaintiffs' dominant estate. We notice and compare the decision in *Traylor v. Parkinson* (1934), 355 Ill. 476, 189 N.E. 307, where the use of a driveway over another's property was held merely convenient but not reasonably necessary to the proper enjoyment of the estates of those claiming an easement by implication because there was sufficient space on their own

properties to build driveways and there was no contention that to do so would cause the owners unreasonable expense. Apparently it would be possible to reach the southern end of the building used as a warehouse by going through the northern end, which is used as a garage. However, given the use of the building for commercial purposes, we are unwilling to say that it was contrary to the manifest weight of the evidence for the trial court to find that the north-south roadway along the west side of the warehouse was also highly convenient and essential to the enjoyment of the dominant estate. For these reasons we affirm the trial court's finding that plaintiffs owned both easements by implication.

We have examined the entire record for evidence of an oral agreement between Melvin Walter and defendant serving to extinguish either or both of the implied easements created in 1961 and in 1965 and have set forth in detail any evidence tending to prove or disprove the existence of such an agreement. By way of summary defendant contends,

> "[T]he claimed easement was extinguished and abandoned by agreement and acceptance of the then owners, long prior to the plaintiff's acquisition of the claimed dominant parcel, and in addition, the plaintiff was advised and warned of lack of access, readily accepted it, and in fact insisted and demanded a terminable license which he was granted and yet comes into Court and complains when his terminable license, that had a specific time on its face, expired."

Unpersuaded by the evidence that such was the case, the trial court found that Melvin Walter and defendant never entered into an agreement extinguishing the easements. We affirm that finding. Melvin Walter's taking Eric Rinderer to see defendant, presumably to discuss access, and having "no objection," as defendant's attorney phrased it—because of disinterest—to any agreement that plaintiff and defendant might work out may hardly be said to constitute an agreement between Melvin Walter and defendant whereby they mutually consented to extinguish either easement. Melvin Walter very much cared that his own access was not permanently interrupted. He communicated that interest to defendant and used the easement as long as he resided on the property. Since he denied any interest in his buyer's means of access, the most that may be said of his cooperation in bringing plaintiff and defendant together is that they, independently of Melvin Walter, may or may not have agreed to extinguish the easement. Certainly Melvin Walter and defendant did not do so.

■■ With respect to the trial court's finding that plaintiffs never acquiesced in the limiting or restricting of the easements, we observe that the testimony of Eric Rinderer and that of defendant and his son were conflicting in every important particular. The trial court had the opportunity

to observe the demeanor of the witnesses and to weigh their credibility. For that reason we will not interfere with his assessment or disturb this finding. A trier of fact could have found the evidence insufficient to show that Eric Rinderer agreed to build his own driveway or acted in any way that indicated an intent to abandon the easements. Similarly, a trier of fact could have found the evidence insufficient to show that Eric Rinderer sought permission to pass over defendant's property. Even if the trial court had found that he had done so, the request would have had no effect upon the existence of the easements. Although the courts in Illinois apparently have not considered the effect of such a request upon an easement, courts in other jurisdictions have done so. They have held that an easement, once established, is not divested by the dominant estate owner's seeking and obtaining permission from the servient estate owner to make the same use of the property as could have been made under the existing easement. *Speer v. Carr* (Mo. 1968), 429 S.W.2d 266; *Allen v. Neff* (1926), 102 W. Va. 230, 135 S.E. 2; *Smith v. Fairfax* (1918), 180 Ky. 12, 201 S.W. 454; *Dee v. King* (1901), 73 Vt. 375, 50 A. 1109.

Defendant stressed at trial and points out in his brief submitted here that the easement through the parking lot on defendant's property is not the site of the east-west cinder roadway in use at the time of severance in 1961. That roadway was obliterated by construction of the apartment building. Much of the testimony concerning this matter is not helpful to the court on review because the witnesses often responded merely by indicating on an exhibit a location described only as "here" or "there." Nevertheless, we have ascertained that the route through the parking lot used by Melvin Walter by agreement with defendant, once the most disruptive of the construction was completed, and later by plaintiffs is very near—just slightly to the south of—the site of the old cinder roadway. Defendant, who was of the opinion that the apartment building covered "the remains of both roadways," that is, both the east-west one to Oak Street and the north-south one to the Highland-Carlyle Road, indicated that the old east-west roadway lies under the porches attached to the apartment building. Defendant seems to suggest that Melvin Walter, by permitting defendant to erect a permanent obstruction upon the old roadway without objection, thereby acted in a way inconsistent with the future enjoyment of the easement and therefore abandoned it. He fails to mention the objection to the obliteration and defendant's resolution thereof to which Melvin Walter testified at trial. Defendant seems also to contend that the "license" plaintiffs accepted from defendant permitted them to pass over an area of his property different from the site of the east-west cinder roadway, that is, different from the site of the easement, and for that reason precluded any claim by plaintiffs of any greater right than a "license."

Illinois courts apparently have not addressed the issue of the consequences, if any, of a relocation of an easement to serve the convenience of the owner of the servient estate. The Court of Appeals of Kentucky in *Chenault v. Gravitt* (Ky. 1905), 85 S.W. 184, 185, considered the question and concluded,

> "A temporary or even permanent change in part of a passway by the owner of the land over which it runs, if made without the consent of one entitled to its use, or with the understanding that he is to continue its use as changed, gives him the same right to the use of such passway as changed that he had to it as formerly located."

The court reached the same result again in *Skaggs v. Carr* (1918), 178 Ky. 849, 200 S.W. 27, ruling that immaterial changes the owner of the servient estate might have made to suit his own convenience would not defeat the dominant estate owner's claim of easement. In *Berkey & Gay Furniture Co. v. Valley City Milling Co.* (1916), 194 Mich. 234, 243, 160 N.W. 648, 652, the Supreme Court of Michigan ruled that if the owner of the servient estate had by its construction and for its own convenience "pushed the way further to the west, the new way would take the place of the former one." So too, in the case at bar, if defendant did provide Melvin Walter access over an area of his property not once part of the east-west cinder roadway, the new way through the parking lot may be considered a substitute for the old one.

Defendant contends that plaintiffs are both estopped from claiming an easement and guilty of laches. He argues that because of Eric Rinderer's knowledge that he would have to provide another means of access to his property and because of his seeking and obtaining permission for a year to cross defendant's property while constructing his own driveway, plaintiffs are estopped from claiming more than the "license" sought, received and acted upon. Defendant maintains that Eric Rinderer slept on "the claimed rights by taking no action of any kind, not even a demand, for a year." He claims,

> "[I]t could be said that if he had knowledge, that he had an easement over defendant's land, although he never testified to any such in trial, he willfully concealed it and willfully mislead [*sic*] the defendant here by demanding and accepting a license to go across a totally different portion of land."

Because we have affirmed the trial court's finding that by requesting the written statement received from defendant concerning access Eric Rinderer did not acquiesce in the limitation or restriction of his rights, we deem defendant's contentions with regard to estoppel to be without merit. Nor do we think it was unreasonable for Eric Rinderer, believing he had an easement over defendant's property, to wait until defendant attempted to interfere with the use of it before he sought the aid of court.

Defendant's statement that plaintiff never testified at trial to any knowledge of an easement is a misstatement of fact.

For the foregoing reasons we affirm the judgment of the trial court of Madison County.

Affirmed.

SPOMER, J., concurs.

Mr. JUSTICE KARNS, dissenting:

Plaintiffs had a ready means of access to their property from the Highland-Carlyle Road (also known as St. Rose Road or Broadway) which bounded both plaintiffs' and defendant's property to the north.

Before an easement by implication may arise, the easement must be necessary to the beneficial enjoyment of the dominant estate. *People ex rel. Helgeson v. Hackler* (1961), 21 Ill. 2d 267, 171 N.E.2d 599.

The evidence here simply suggests that it would be more convenient for plaintiffs to cross defendant's land, but not reasonably necessary. Plaintiffs could, with relative ease, according to the testimony of their engineer, construct an access road to the Highland-Carlyle Road. Defendant even offered the use of his bulldozer to cut through the slope or embankment at the north of plaintiffs' property to grade at Highland-Carlyle Road. Plaintiffs were aware of the access problem when they purchased the property.

In *Miller v. Schmitz* (1980), 80 Ill. App. 3d 911, 400 N.E.2d 488, we recognized, quoting the Restatement of Property §476, comment *g*, at 2983 (1944), that absolute necessity was not necessary to the creation of an easement by implication. There, the alternative to allowing the landowner access to property over his neighbor's land would have required the construction of a bridge, after descending a precipitous 40-foot slope, over a 40-foot wide creek that intermittently overflowed one or two times each spring and often during crop season, in order to farm a parcel of property returning an annual gross income of $500 to $600. We held there that the element of "necessity" was satisfied. Here, we are merely dealing with convenience, which in my opinion, is not sufficient to imply an easement over the parking lot of a neighbor's apartment complex.