RICHARD O'HARA *et al.*, Plaintiffs-Appellees, *v.* CHICAGO TITLE AND TRUST COMPANY, Trustee, *et al.*, Defendants-Appellants.

First District (5th Division)   No. 81—2575

Opinion filed April 22, 1983.—Rehearing denied July 19, 1983.

James West and Rock, Fusco, Reynolds & Heneghan, both of Chicago (William Paul Jones, of counsel), for appellants.

Cyril J. Watson, of Mitchell, Russell and Kelly, of Chicago (Edward J. Egan, of counsel), for appellees.

PRESIDING JUSTICE WILSON delivered the opinion of the court:

Plaintiffs, Richard O'Hara and Exchange National Bank (as trustee), beneficial and legal owners, respectively, of real estate com-

monly known as 1560 North Wells Street, Chicago, Illinois (Parcel A), filed a complaint against defendants, Daniel O'Brien and Chicago Title and Trust Company (as trustee), beneficial and legal owners, respectively, of real estate commonly known as 1556 North Wells Street, Chicago, Illinois (Parcel B), seeking injunctive and declaratory relief. Specifically, plaintiffs sought to enjoin defendants from maintaining a fence along the northern boundary of Parcel B that abuts Parcel A on the ground that the fence effectively bars plaintiffs from using the right-of-way located along the northern boundary of Parcel B. Furthermore, plaintiffs sought a declaratory judgment stating that the right-of-way located on Parcel B was either: (1) an implied easement appurtenant attaching to and for the use and benefit of Parcel A; or (2) an easement by prescription attaching to and for the use and benefit of Parcel A. Following a bench trial, the court entered judgment granting plaintiffs an easement by implication and permanently enjoining defendants from erecting a fence or any other obstruction along the northern boundary of Parcel B which would interfere with plaintiffs' use of the easement. Defendants' sole issue on appeal is whether plaintiffs have met their burden of proof in establishing the essential prerequisites of an implied easement. For the reasons that follow, we reverse the trial court.

A. *History of Ownership of Parcel A*

In 1946, Frank Herhold owned the property and improvements on both Parcel A and Parcel B in fee simple. The improvements on Parcel A included a four-story brick building, which occupied the full width of the parcel and allowed approximately 47 feet for a rear yard. At that time, the Parcel A building had four doors, two in the front (east), facing Wells Street, and two in the rear (west), facing the rear yard. The buildings on Parcel A and Parcel B were joined by a party wall.

On May 28, 1946, Herhold conveyed Parcel A to George Adams in fee simple. There is no indication in the record as to how Adams used the property. In 1959/1960, Adams constructed a three-story addition to the rear of the Parcel A building which extended across the full width of the parcel, and allowed some footage for a rear yard. When the addition was completed, the building had three doors, one in the front (east), facing Wells Street, one in the rear (west), facing the rear yard, and one on the side of the new addition (south), opening directly onto Parcel B.

In 1963, William Mallick executed a contract to purchase Parcel A from Adams. Mallick, however, never actually purchased Parcel A. In-

stead, he immediately assigned the contract to Al Kaiser in trust. The Kaiser trust, in which Mallick had no ownership interest, then purchased Parcel A and executed a 20-year lease for the building thereon to Mallick.

When Mallick leased the building on Parcel A, there was no business operating on the premises. In late 1963/early 1964, Mallick began remodeling the Parcel A building in conformance to code for a restaurant and lounge. In so doing, he added a one-story kitchen directly behind the three-story addition. With the completed kitchen addition, the Parcel A building occupied the full width and depth of the property, and had three doors, one in the front (east), facing Wells Street, and two on the south side (three-story addition and kitchen), opening directly onto Parcel B. In 1971, Mallick ceased his restaurant operation. The record is void as to how either parcel was used from 1971 until 1973 when Cafe-Continental, Inc., leased Parcel A from the Kaiser trust and operated a restaurant thereon called "Sesame" until August 1980.

### B. *History of Ownership of Parcel B*

In 1946, when Herhold owned the property and improvements on both Parcel A and Parcel B in fee simple, Parcel B contained a three-story brick building with a rear yard and 6½-foot walkway which ran along the south side of the building.

In 1948, Herhold conveyed Parcel B to Walter Shellock. Although the record does not fully trace the ownership of Parcel B from 1948 to 1959, it does indicate that it was purchase by John Krenger in 1959/1960. At the time Krenger purchased Parcel B, Adams was constructing the three-story addition on the Parcel A building. At trial, Krenger testified that after Adams added the south door onto his addition, Adams began to exit from that door, walk across the rear yard of Parcel B and down the walkway which led to Wells Street. Krenger objected to Adams' use of his property as a right-of-way and subsequently erected a gate across the walkway which he kept padlocked. Krenger retained the only key to the lock.

In 1964/1965, shortly after Mallick (lessee of Parcel A) had completed the kitchen addition on the Parcel A building, Krenger executed a 10-year lease with Mallick for Parcel B, the terms of which gave Mallick the option to demolish the building on Parcel B. In his evidence deposition, Mallick indicated that prior to leasing Parcel B from Krenger, there was a gate across the walkway located along the south side of the Parcel B building. During the day, Krenger permitted Mallick to use the walkway gratis to bring in building supplies for

use on Parcel A. At night, however, Krenger locked the gate for security reasons. After Mallick demolished the Parcel B building in 1966, he used the parcel as a parking lot for his restaurant, as well as for deliveries and garbage removal. In 1973, two years after Mallick prematurely terminated his leases in both parcels, owners of the Sesame restaurant (subsequent sublessees of Parcel A) arranged with Krenger to pay a monthly fee for the use of Parcel B as a parking lot for their restaurant and for deliveries and garbage removal.

### C. *Current Ownership of Parcel A and Parcel B*

In October/November, 1977, O'Hara purchased Parcel A in fee simple from the Kaiser trust, subject to Cafe-Continental, Inc.'s lease, and deeded the property to a land trust. When Cafe-Continental, Inc.'s lease terminated for nonpayment of rent in August 1980, plaintiffs began remodeling the restaurant and opened an Italian restaurant in December 1980. When O'Hara purchased Parcel A, the building thereon had three doors: one on the front (east), facing Wells Street and two on the south wall of the building, opening directly onto Parcel B. Lum's restaurant was located immediately to the north and Azteca restaurant was located directly to the west. After their restaurant opened, plaintiffs continued to use Parcel B as a right-of-way for deliveries and for removal of trash.

In 1978, Daniel O'Brien purchased Parcel B from John Krenger in fee simple and deeded the property to a land trust with Mary and Daniel O'Brien as beneficiaries. At the time he purchased Parcel B, O'Brien had knowledge of Sesame's operations on Parcel A. In fact, O'Brien collected a fee from the owners of that restaurant for the use of Parcel B. About six months after his purchase of Parcel B, in mid-1979, O'Brien began making the necessary repairs and improvements to the property for use as a parking lot. These repairs included mending existing and erecting new six-foot chain link fencing around the perimeter of the parking lot, resurfacing damaged pavement and replacing damaged lighting and signs.

At trial, O'Hara testified that, commencing in 1978, he had several communications with either Daniel O'Brien, his attorney, James West, or his agent, Mr. Sergetelli, regarding use of the side doors on the Parcel A building. The first conversation occurred with Sergetelli in September 1978, shortly after O'Brien purchased Parcel B. Sergetelli told O'Hara that O'Brien was interested in purchasing Parcel A. O'Hara told him it was not for sale. Sergetelli continued to contact O'Hara every four to five weeks thereafter, asking him if he had reconsidered. O'Hara stated that over this period of time, the tone of

his conversations with Sergetelli changed and there were innuendos that O'Brien was politically aligned, that it would cost a good deal to get a restaurant license for such an old building, and that O'Hara would be facing numerous building violations. Thereafter, West sent a letter to O'Hara, dated May 3, 1979, notifying O'Hara that as of that date, the occupants or tenants of Parcel A would not be allowed to use Parcel B for any reason. The letter further informed O'Hara that a fence was going to be erected in the near future which would prevent his use of Parcel B. In late 1979, O'Hara called O'Brien directly because he was having problems with building violations and inspectors. In the course of that conversation, O'Hara again told O'Brien that he would not sell, to which O'Brien allegedly replied, "Do you realize you're landlocked?"

O'Hara further testified that during the time that he was remodeling his restaurant, he would occasionally park his car in O'Brien's unattended parking lot. Within one month, O'Brien approached O'Hara in the parking lot and asked him if he wanted to rent the space for his car. O'Hara declined, but said that he might reconsider later.

On December 7, 1980, O'Hara opened his restaurant and commenced using the easternmost side door as a service entrance and emergency exit. Prior to this, despite O'Brien's warnings, he had used the side doors for deliveries and garbage removal. On opening day, O'Hara talked to O'Brien about use of the doors and offered him $450 a month for use of the parking lot for customer parking. This was allegedly the amount Sesame paid to O'Brien previously. In response, O'Brien stated that he wanted $650 per month for 200 cars and an additional $3 per car over that. O'Hara projected that he would have about 50 cars per day and, thus, could not afford O'Brien's price. When O'Hara presented a counteroffer, O'Brien indicated that he would think about it. Shortly thereafter, O'Hara received another written notice from O'Brien stating that a wall or fence was to be built along the north boundary of Parcel B which would block the use of the side doors on O'Hara's restaurant.

Subsequently, on January 1, 1981, approximately 3 a.m., O'Brien knocked on the side door of O'Hara's restaurant and angrily told O'Hara to remove his garbage cans from the parking lot, which O'Hara promptly did. O'Hara stated that he paid O'Brien for use of the parking lot for customer parking in January and February, 1981. The record, however, does not indicate what the arrangements were made for those months.

Approximately one month later, O'Brien completed the erection of

fencing around the perimeter of his parking lot. Upon completion, fencing existed along the south, west and north boundaries of Parcel B. On the north boundary, the fencing stopped a few feet east of the easternmost side door of the restaurant rather than extend all the way to the sidewalk because the restaurant's wall extends out approximately 12 to 18 inches at that point and meets flush with the fence. O'Hara testified that prior to the erection of the fence along Parcel A's building, the easternmost side door was used for deliveries, removing garbage and trash, as well as an emergency exit. The other side door located on the kitchen addition was used about once a week as an auxiliary means of ingress and egress and was bolted from the inside. Currently, the kitchen door, which is set back from the building's outer wall approximately eight feet to form a passageway, is blocked by various construction debris which is stored in the passageway itself. Erection of the fence blocking Parcel A's side doors has curtailed deliveries to the kitchen, garbage removal and has closed off all emergency exits. Currently, there is only one accessible door on the east side of the building, facing Wells Street. While it is physically possible for someone to turn sideways and squeeze himself into the 12-inch width between the fence and Parcel A's building, he would be trapped to the east by the building's 12-inch extension which meets the fence, and, thus, would have to exit west to Weiland Avenue. In Mallick's evidence deposition, he stated that use of the alleged right-of-way over Parcel B is "totally necessary and highly beneficial" to the restaurant.

Daniel O'Brien testified that he actively pursued a parking fee arrangement with O'Hara, but was unable to reach an agreement. Initially, O'Hara's partner informed O'Brien that they would be willing to pay $500 per month for parking privileges. As a result, O'Brien asked O'Hara for $500 per month with limited parking privileges of 30 cars per day. However, O'Hara refused those terms. O'Brien admitted that either he or his agents had had numerous conversations with O'Hara regarding O'Brien's desire to purchase Parcel A, but stated that he no longer wanted to do so because he is contemplating construction of a high-rise on Parcels B and C which he currently owns. Parcels B and C extend east and west from Wells Street to Weiland Avenue and Parcel A would not "square out" with this property because it does not extend as far west as Weiland Avenue. O'Brien stated that there were no formal plans or financing arrangements for construction of the high-rise at this time.

When questioned about the gate placed directly in front of the restaurant's easternmost side door, O'Brien stated that the gate was

so situated because O'Brien's son, Peter, had been negotiating with O'Hara regarding the use of the Parcel B parking lot for O'Hara's customer parking. Currently, the gate has a chain and padlock on it for which the parking lot attendant has the key. Further, O'Brien admitted that he was aware of the Chicago ordinance that requires more than one exit for any business, but stated that he never consciously thought about this when he erected the fence next to Parcel A. Rather, he merely wanted to secure his property against vandalism and to protect O'Hara's building from being damaged by cars in the parking lot. O'Brien also testified that, if the debris were removed from the westernmost side door of the restaurant, there would be enough space to walk through the 12- to 18-inch passageway between the fence and the restaurant.

After Daniel O'Brien's testimony, plaintiffs rested their case, at which point defendants moved for judgment directed in their favor. In support of their motion, defendants asserted that no showing had been made that an easement exists on Parcel B for the benefit of Parcel A. In reply, plaintiffs asserted that the complaint sought relief on two theories: (1) easement by implication, and (2) easement by prescription. In that regard, there is no question there was unity of ownership and separation of title. Defendants countered that because there was no evidence as to what was going on in the Parcel A building prior to 1963, the prerequisite of continuous use had not been established for imposition of an easement by prescription. The court stated that the motion would be taken under advisement.

Subsequently, Peter O'Brien, Daniel O'Brien's son and vice-president of O'Brien Management, managers of Parcel B, testified that the fence was erected around the parking lot so as to prevent perpetrators of crimes on Wells Street from using it as an escape route and also to protect the cars of the parking lot patrons. Previously, a car had been stolen from the lot. O'Brien further stated that he had his first conversation with O'Hara regarding his leasing of the parking lot for a one-year term in December 1980. O'Brien offered use of the parking lot for garbage removal and limited daily parking for $550 per month. O'Hara made a counteroffer of $400-$450 per month. No agreement was reached. O'Brien's next conversation with O'Hara occurred in January 1981, when he offered use of the lot for garbage removal and unlimited parking for $550 per month. This time, O'Hara made a counteroffer of $500 per month. Again, no agreement was reached. O'Brien indicated that the lot is used by the public at large and is also rented by four merchants as a parking facility for their customers. O'Brien admitted that prior to the time O'Hara opened his

business in 1980, he knew O'Hara was using the side door for deliveries.

At the conclusion of closing arguments, the court stated that it would take the matter under advisement. In the interim, prior orders stating that the gate across the restaurant's side door was to remain open and that the side door was to be used as an emergency exit only were to remain in full force and effect.

Final judgment was entered on June 3, 1981, holding that plaintiffs' right-of-way over Parcel B was an implied easement and ordering removal of the fence erected between Parcels A and B. Thereafter, upon receiving the legal description of the easement provided for in its first order, the court entered a derivative order granting an easement appurtenant over, upon and across the therein-described portion of Parcel B for the benefit of Parcel A. Defendants then filed post-trial motions requesting the court to vacate its June 3, 1981, judgment and derivative orders, or, in the alternative, requesting a new trial. The court denied the post-trial motions. Defendants' timely appeal followed.

OPINION

■ The doctrine of implied easements is based upon the principle that where the owner of a single tract has arranged it so that one portion thereof derives a benefit from the other of an apparent and continuous character, and then sells one of such parts without mention being made of these incidental uses, the purchaser takes the portion sold with all the benefits and burdens which appear at the time of sale to belong to it. (*Swieton v. Landoch* (1982), 106 Ill. App. 3d 292, 298, 435 N.E.2d 1153.) As set forth in the seminal case of *Carter v. Michel* (1949), 403 Ill. 610, 617, 87 N.E.2d 759, 762, the essential elements which must exist to create an easement by implication are: (1) unity of ownership and separation of title; (2) before the separation occurs, the use which would give rise to an easement must have been so long-continued, obvious or manifest that it would show the use was meant to be permanent; and (3) the use of the claimed easement must be essential to the beneficial enjoyment of the land granted or retained. Further, whether an easement by implication was created must be determined as of the time it was severed from the other land of the grantor. (*Walker v. Witt* (1954), 4 Ill. 2d 16, 20, 122 N.E.2d 175.) The burden of proof rests on the party seeking the easement to establish the elements necessary to raise an easement by implication. (*Rexroat v. Thorell* (1982), 89 Ill. 2d 221, 229, 433 N.E.2d 235.) On review, a court will not disturb the findings of a trial court as to

proof of the elements unless they are against the manifest weight of the evidence. *Rinderer v. Keeven* (1980), 90 Ill. App. 3d 34, 48, 412 N.E.2d 1015.

■ We first address the prerequisite of unity of ownership and severance of title. O'Brien asserts that the sole severance of title occurred in 1946 when Frank Herhold conveyed Parcel A to George Adams in fee simple. O'Hara, on the other hand, argues that severance of title occurred in 1946 and again in 1977 when William Mallick conveyed his interest in Parcel A. It is our opinion that severance of title occurred only in 1946, and, thus, that date becomes the operative point at which servitudes on the land must have existed. We base this determination on the undisputed fact that William Mallick never had title to either Parcel A or Parcel B. Regarding Parcel A, Mallick signed a contract to purchase which he immediately assigned to Al Kaiser in trust. Mallick had no interest in the trust and the deed was never conveyed to Mallick from Adams. Mallick merely acquired a leasehold interest in parcel A from the Kaiser trust. Regarding Parcel B, Mallick again acquired only a leasehold interest from John Krenger. Although the terms of the lease gave Mallick control over the use of Parcel B, it was, nevertheless, only a leasehold interest and not an ownership interest. Therefore, the facts unequivocally demonstrate that the relevant severance of title occurred in 1946.

■ We next address the prerequisite that the use giving rise to the easement must have existed prior to severance. (*Cosmopolitan National Bank v. Chicago Title & Trust Co.* (1955), 7 Ill. 2d 471, 475, 131 N.E.2d 4.) In our case, the use must have existed prior to Herhold's severance of title in 1946. At that time, Parcel A contained an unimproved four-story building with four doors, two in the front (east), facing Wells Street and two in the rear (west), facing the rear yard. The record is void of explanation as to the use, if any, of the land immediately north and west of Parcel A prior to severance or at the time of severance. Plaintiffs argue that Parcel B was used from the rear doors of Parcel A prior to severance in 1946. However, they failed to establish any proof of this use either by testimony or documentary evidence. Plaintiffs also argue that pursuant to *Miller v. Schmitz* (1980), 80 Ill. App. 3d 911, 400 N.E.2d 488, proof of prior use by the common grantor is not necessary when land in its present form could either not be used without an easement, or use without an easement would necessitate disproportionate effort and expense. In *Miller,* as in our case, there was no direct evidence regarding the common grantor's access to Miller's tract. The *Miller* court concluded, however, that access across defendant's property must have

been in use because the only other approach would have been across a creek. Thus, the court imposed an easement by implication across defendant's property. We find the situation at bar to be factually distinguishable from that in *Miller*. As previously stated, there is no evidence in the record that the only access to Parcel A in 1946 was over Parcel B. To the contrary, the record indicates that the Parcel A building had two front doors which opened onto Wells Street. By virtue of that fact alone, it was not landlocked in 1946 and *Miller* is inapplicable. Plaintiffs next argue that, pursuant to Chicago's building code, it cannot operate its restaurant on Parcel A without a minimum of two exits. If the use of the restaurant's side doors is blocked by the fence, the building is left with only one exit to Wells Street and, thus, will have to close its operation because there is no reasonable place for another exit to be added.

While we sympathize with plaintiffs' plight, we do not find it persuasive of the position that an easement has been created. First, it is well established that where such alternative means of access exist and do not create an unreasonable burden, courts must exercise due continence in implying and imposing a burden over the lands of another through imposition of an easement by implication. (*Rinderer v. Keeven* (1980), 90 Ill. App. 3d 34, 48, 412 N.E.2d 1015.) In the case at bar, plaintiffs have two alternatives: (1) construct a second door on the east side of the building for deliveries, garbage pickup and emergency exit; (2) contract with defendants for the use of Parcel B. The record indicates that defendants have been willing to execute such a contract for some time and, in fact, have been actively negotiating with plaintiffs in good faith to do so. It is unrealistic for plaintiffs to presume that they can have use of defendants' property gratis when they purchased Parcel A with the knowledge that Sesame restaurant paid a monthly fee for the use of Parcel B. Furthermore, we find the offered price to be not so unreasonable that an agreement could not be reached between the parties. In fact, testimony indicates that at one point the parties were within $50 of establishing a monthly fee with unlimited parking privileges.

Second, the facts indicate that plaintiffs, in effect, created their own necessity which they now rely upon as grounds for imposition of an easement. As early as May 3, 1979, while the Sesame restaurant was still in operation, plaintiffs were notified by letter that use of Parcel B for parking, delivery, garbage pickup and storage would have to cease, and that a fence prohibiting such use was to be erected in the near future. Yet, plaintiffs commenced renovation of the restaurant on Parcel A anyway. When it became apparent to defendants

that plaintiffs were going to continue use of Parcel B and refuse to compensate defendants for that use, they erected the fence. It is our opinion that plaintiffs renovated the restaurant on Parcel A at their own risk and defendants should not be deprived of full use and enjoyment of their property because of plaintiffs' irresponsible actions. Further, the fact that defendants placed a gate in front of plaintiffs' side door suggests nothing more than an attempt to keep the options open regarding plaintiffs' use of Parcel B.

Based on the aforementioned, we conclude that plaintiffs have failed to prove the second essential element for finding an easement by implication. Accordingly, because all three elements must be established in order to create such an easement (*Walker v. Witt* (1954), 4 Ill. 2d 16, 21, 122 N.E.2d 175), we deem it unnecessary to address the third element that the use be essential to the beneficial enjoyment of the land.[1]

■ As an alternative argument, plaintiffs claim that they have an irrevocable license to use the right-of-way over Parcel B. A license, as it relates to real property, is permission to do an act or a series of acts upon the land of another without possessing any estate or interest in such land. (*Mueller v. Keller* (1960), 18 Ill. 2d 334, 340, 164 N.E.2d 28.) Mere permission to use land cannot ripen into a prescriptive right, regardless of the time such permissive use is enjoyed. (*Keck v. Scharf* (1980), 80 Ill. App. 3d 832, 835, 400 N.E.2d 503.) Further, unless the evidence is clearly to the contrary, a court will presume that a parol agreement to impress property with a servitude was made without knowledge of the provisions of the statute of frauds, and was therefore intended as a license only and not as an easement or other interest in land. (*Petersen v. Corrubia* (1961), 21 Ill. 2d 525, 532, 173 N.E.2d 499.) In addition, it is in the nature and definition of a license that, in the absence of fraud, it is revocable at the will of the licensor. A parol license may be revoked by express notice, by acts which are entirely inconsistent with enjoyment of the use, or by appropriating the land in question to any use contrary to its enjoyment by the licensee. In fact, a parol license is subject to revocation even where consideration has been paid or expenditures have been made in reliance on such an agreement. *Keck v. Scharf* (1980),

---

[1]Although the trial court did not specifically rule on count II of the complaint regarding an easement by prescription, we note that to establish such a right of way, use must be adverse, uninterrupted, exclusive, continuous, and under claim of right for a period of 20 years. (*Rita Sales Corp. v. Bartlett* (1970), 129 Ill. App. 2d 45, 52, 263 N.E.2d 356.) After careful review of the record, we find that plaintiffs have failed to establish such use for the specified duration.

80 Ill. App. 3d 832, 836, 400 N.E.2d 503.

In the case at bar, if a license existed at all, it was a parol license revocable at will. The facts indicate such a revocation occurred on May 3, 1979, by express notice in the form of a letter written to plaintiffs by the attorney for defendants. In addition, erection of the fence barring use of the restaurant's side doors was a further act of revocation as it certainly could be construed as nothing less than an act entirely inconsistent with plaintiffs' use of Parcel B.

Plaintiffs' assertion that defendants' act of revocation constituted a fraud and is, therefore, void is untenable. This court has specifically limited this doctrine of estoppel to those cases where large sums of money have been expended under the license, partly for the benefit of the licensor, and where the position of the licensee had been so changed at the request of the licensor that he could not be restored to his original position or be compensated in damages. (*Ideal Trading Corp. v. 237 E. Ontario Corp.* (1967), 82 Ill. App. 2d 160, 168, 227 N.E.2d 150.) In the pending case, defendants, as licensors, received no benefit from plaintiffs' expenditures to remodel the restaurant on Parcel A. If anything, such expenditures resulted in a detriment to defendants. More importantly, plaintiffs' property was not changed at the request of defendants. Thus, any expenditures made by plaintiffs were made at their own risk. Accordingly, we find that if any license existed between plaintiffs and defendants regarding the use of Parcel B, it was effectively revoked and no such privilege currently exists.

For the reasons stated, we hold that the evidence failed to support the trial court's finding of an easement by implication in favor of plaintiffs and therefore reverse the judgment of the circuit court of Cook County.

Reversed.

LORENZ and MEJDA, JJ., concur.