IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

January 2019 Term

_____

No. 18-0181

_____

FILED

June 11, 2019

released at 3:00 p.m.
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

JOSEPH MICHAEL CANTRELL, KAREN (CANTRELL) LEONARD,
CRAIG CANTRELL, and KIM (CANTRELL) MAY,
Petitioners Below, Petitioners

v.

JEFFERSON DAVID CANTRELL and LESLIE CHARLENE CANTRELL,
Respondents Below, Respondents

_____

Appeal from the Circuit Court of Mingo County
The Honorable John L. Cummings, Judge
Civil Action No. 15-C-55

AFFIRMED

_____

Submitted: February 13, 2019
Filed: June 11, 2019

C. Christopher Younger, Esq.                M. Timothy Koontz, Esq.
Williamson, West Virginia                   Law Offices of M. Timothy Koontz
Counsel for the Petitioners                 Williamson, West Virginia
                                            Counsel for the Respondents

CHIEF JUSTICE WALKER delivered the Opinion of the Court.

1.        ""'Unless an absolute right to injunctive relief is conferred by statute, the power to grant or refuse or to modify, continue, or dissolve a temporary or a permanent injunction, whether preventive or mandatory in character, ordinarily rests in the sound discretion of the trial court, according to the facts and the circumstances of the particular case; and its action in the exercise of its discretion will not be disturbed on appeal in the absence of a clear showing of an abuse of such discretion.' Syl. pt. 11, *Stuart v. Realty Corp.*, 141 W.Va. 627, 92 S.E.2d 891 (1956).' Syl. Pt. 1, *G Corp, Inc. v. MackJo, Inc.*, 195 W.Va. 752, 466 S.E.2d 820 (1995)." Syllabus Point 1, *Baisden v. West Virginia Secondary Schools Activities Commission*, 211 W. Va. 725, 568 S.E.2d 32 (2002).

2.        "'This Court reviews the circuit court's final order and ultimate disposition under an abuse of discretion standard. We review challenges to findings of fact under a clearly erroneous standard; conclusions of law are reviewed *de novo*.' Syl. Pt. 4, *Burgess v. Porterfield*, 196 W.Va. 178, 469 S.E.2d 114 (1996))." Syllabus Point 1, *Wilson v. Staats*, 232 W. Va. 227, 751 S.E.2d 747 (2013).

3.        "A person claiming a prescriptive easement must prove each of the following elements: (1) the adverse use of another's land; (2) that the adverse use was continuous and uninterrupted for at least ten years; (3) that the adverse use was actually known to the owner of the land, or so open, notorious and visible that a reasonable owner

i

of the land would have noticed the use; and (4) the reasonably identified starting point, ending point, line, and width of the land that was adversely used, and the manner or purpose for which the land was adversely used." Syllabus Point 1, *O'Dell v. Stegall*, 226 W. Va. 590, 703 S.E.2d 561 (2010).

4. "A person claiming a prescriptive easement must establish each element of prescriptive use as a necessary and independent fact by clear and convincing evidence, and the failure to establish any one element is fatal to the claim." Syllabus Point 3, *O'Dell v. Stegall*, 226 W. Va. 590, 703 S.E.2d 561 (2010).

5. "In the context of prescriptive easements, the term 'adverse use' does not imply that the person claiming a prescriptive easement has animosity, personal hostility, or ill will toward the landowner; the uncommunicated mental state of the person is irrelevant. Instead, adverse use is measured by the observable actions and statements of the person claiming a prescriptive easement and the owner of the land." Syllabus Point 4, *O'Dell v. Stegall*, 226 W. Va. 590, 703 S.E.2d 561 (2010).

6. "In the context of prescriptive easements, an 'adverse use' of land is a wrongful use, made without the express or implied permission of the owner of the land. An 'adverse use' is one that creates a cause of action by the owner against the person claiming the prescriptive easement; no prescriptive easement may be created unless the person claiming the easement proves that the owner could have prevented the wrongful use

by resorting to the law." Syllabus Point 5, *O'Dell v. Stegall*, 226 W. Va. 590, 703 S.E.2d 561 (2010).

7. "'There are two forms of implied easements: an easement implied by necessity (which in West Virginia is called a 'way of necessity'); and an easement implied by a prior use of the land (also called an easement implied from a 'quasi-easement').' Syl. Pt. 3, *Cobb v. Daugherty*, 225 W. Va. 435, 693 S.E.2d 800 (2010)." Syllabus Point 2, *Wilson v. Staats*, 232 W. Va. 227, 751 S.E.2d 747 (2013).

8. "'The law does not favor the creation of easements by implied grant or reservation.' Syllabus point 1, *Stuart v. Lake Washington Realty*, 141 W.Va. 627, 92 S.E.2d 891 (1956)." Syllabus Point 1, *Cobb v. Daugherty*, 225 W.Va. 435, 693 S.E.2d 800 (2010).

9. "'The burden of proving an easement rests on the party claiming such right and must be established by clear and convincing proof.' Syllabus point 1, *Berkeley Development Corp. v. Hutzler*, 159 W.Va. 844, 229 S.E.2d 732 (1976)." Syllabus Point 2, *Cobb v. Daugherty*, 225 W. Va. 435, 693 S.E.2d 800 (2010).

10. "To establish an easement implied by necessity (which in West Virginia is called a 'way of necessity'), a party must prove four elements: (1) prior common ownership of the dominant and servient estates; (2) severance (that is, a conveyance of the

dominant and/or servient estates to another); (3) at the time of the severance, the easement was strictly necessary for the benefit of either the parcel transferred or the parcel retained; and (4) a continuing necessity for an easement." Syllabus Point 4, *Cobb v. Daugherty*, 225 W. Va. 435, 693 S.E.2d 800 (2010).

11.    "'If one has a reasonable outlet over his own property, he cannot exact a more convenient way as of necessity over the premises of another.' Syllabus point 2, *Dorsey v. Dorsey*, 109 W.Va. 111, 153 S.E. 146 (1930)." Syllabus Point 5, *Cobb v. Daugherty*, 225 W. Va. 435, 693 S.E.2d 800 (2010).

12.    "To establish an easement implied by a prior use of the land, a party must prove four elements: (1) prior common ownership of the dominant and servient estates; (2) severance (that is, a conveyance of the dominant and/or servient estates to another); (3) the use giving rise to the asserted easement was in existence at the time of the conveyance dividing the property, and the use has been so long continued and so obvious as to show that the parties to the conveyance intended and meant for the use to be permanent; and (4) the easement was necessary at the time of the severance for the proper and reasonable enjoyment of the dominant estate." Syllabus Point 6, *Cobb v. Daugherty*, 225 W. Va. 435, 693 S.E.2d 800 (2010).

WALKER, Chief Justice:

This case is a dispute among five adult children of the late Beulah and Delmon Cantrell about whether an easement exists across property now owned by one sibling to allow ingress to and egress from adjacent property owned by the other four siblings. Michael, Karen, Craig and Kim (Petitioners)[1] filed a petition for injunctive relief against David (and his wife Leslie)[2] claiming that the easement is necessary for them to access their property. Respondents David and Leslie contended that Petitioners could not establish an easement by prescription or implication. After a three-day bench trial, the circuit court refused the injunction because (1) Petitioners' use of Respondents' property was permissive, so Petitioners failed to prove the adverse use required for a prescriptive easement; and (2) Petitioners offered no credible evidence of strict or reasonable necessity or prior use, and thus failed to establish an implied easement. We agree and affirm the circuit court's order.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

In the 1960's, the late Beulah Cantrell (Mother) and the late Delmon Cantrell (Father) purchased a parcel of real estate in Varney, West Virginia, known as Lots 88

---

[1] Petitioners are siblings Michael Cantrell, Karen (Cantrell) Leonard, Craig Cantrell and Kim (Cantrell) May.

[2] Respondents are David and Leslie Cantrell. David is the sibling of Michael, Karen, Craig and Kim.

through 93 and 124 through 129 (the Cantrell Property).[3]  Together, these twelve lots

created a rectangular-shaped property with the east edge flush against the west side of

White Street.  On the north, the property bordered Second Avenue and on the south, First

Avenue.[4]



*Figure 1*

---

[3] Mother and Father obtained the lots in three separate purchases.  Lots 127–129 were purchased in 1960.  Lots 124–126 were purchased in 1963.  Lots 88–93 were purchased in 1973.

[4] Figure 1 is a survey of the properties prepared by Dexter Branham, a professional surveyor, that was introduced by Petitioners as an exhibit at trial.  We reference this survey to clarify the location of the various lots and alleged easement.  Also, to avoid confusion, we reference the various parcels of property and home sites discussed in this Opinion in the same manner as the circuit court's order and parties' briefing.

Before 2006, the Cantrell Property had two residences on it, both on the northern half of the rectangle, on Lots 124 through 129 (Old Property). There was an old, small, wooden residence (the old home place) on Lots 127 through 129, and a larger, brick home (the new home place) on Lots 124 through 126.

In 1979, Mother and Father moved out of the old home place and into the new home place where they lived until their deaths. Petitioner Craig now lives in the new home place. When Father and Mother vacated the old home place in 1979, Petitioner Michael moved in. In 1984, Respondent David built a home on Lots 88 through 93 of the southern half of the Cantrell Property.[5] Petitioners Karen and Kim each now live in Kentucky.

In 1991, Michael (and his wife Sheila) purchased eight lots adjacent to and on the west side of the Cantrell Property, Lots 130 through 133 and Lots 84 through 87 (New Property). The New Property is a rectangular-shaped property with the west edge flush against the east side of Varney Street and the east edge flush against the west edge of the Cantrell Property. It is bordered on the south by First Avenue and on the north by Second Avenue. Before Michael's purchase in 1991, the New Property had never been

---

[5] Although Respondents constructed their home on these lots in 1984, they did not obtain actual title to the property until Father's death in 2006.

owned by any member of the Cantrell family. After Michael's purchase of these lots in 1991, he constructed a road across the lots. [6]

In June 1999, Michael (and Sheila) sold the New Property to David (and Leslie). Michael intended to use the sale proceeds to construct a new home on a completely separate, adjacent parcel on the other side of Varney Street.[7] Indisputably, there was no express easement burdening the New Property at the time Michael sold it to David.

David and other family members helped Michael build his new home and allowed Michael to store equipment and cut timber on the New Property during its construction. When Michael's new home was completed in August 2006, he vacated the old home place and moved into his new house. Soon after, in the fall of 2006, the parties razed the old home place on Lots 127 through 129 of the Cantrell Property.

Michael testified that after he sold the New Property to David in 1999, he continued to use the New Property to park vehicles, store timber, and operate a small saw

---

[6] The parties disagree about where this road ended. Petitioners allege that the road was built to access his then residence at the old home place on the Old Property. However, Respondents contend that while there used to be a road on the New Property, it only went up to the house that was previously on the property, not his residence on the Old Property. Respondents maintain that the house on the New Property was torn down by Michael in 1991 and that Respondents excavated the property when they purchased it in 1999 and removed that road to the prior house seat.

[7] This is the location of Michael's current home and it is not the subject of this case.

4

mill during the construction of his new home. After the completion of his new home in 2006, Michael testified that he continued to drive across the New Property when visiting with Craig and Mother until her death in 2009. Michael also testified that he continued to access his saw mill on the New Property until it was removed in 2010.

Mother passed away in November 2009 and through her last will and testament, Petitioners obtained title to the Old Property (Lots 124 through 129). Craig, who acquired a life estate in these lots, continues to reside in the new home place, and the other Petitioners have remainder interests in the lots. David was not included in the devise of the Old Property, as he had already been given Lots 88 through 93 by deed in August 2006.

At some point, the familial relationship soured. Respondents allege that Petitioners never complained about having an easement across the New Property until Respondents prosecuted Craig's son for breaking into their storage building on David's property in 2012 or 2013. In 2015, Petitioners disconnected the water supply to Respondents' home from a private well located on the Old Property. Respondents had drawn water from the well, with Father's permission, for twenty-five years. As a result of the disconnection, Respondents spent $1,500 to restore water to their home by city water access and now pay a monthly water bill.

In March of 2015, Petitioners filed a petition for injunctive relief seeking to establish an easement across Respondents' property, either by prescription or implication, for ingress to and egress from the Old Property. According to the petition, Petitioner Craig Cantrell intends "to construct a dwelling, for use as a rental," on the Old Property and so Petitioners "believe it is necessary to establish the right-of way to the tract . . . to ensure the establishment and continued use of the same by recorded instrument." Petitioners contended that Lots 128–129 are landlocked and inaccessible by any other means than through the Respondents' property because there are two septic tank systems that cannot be relocated filling all the yard space of the new home place, which might allow access to these lots from White Street for construction purposes. They also alleged that the area above lots 128–129, which was traditionally accessed by steps, is too steep and rocky for vehicular access.

In response to the petition for injunction, Respondents argued that Petitioners could not establish an easement by prescription or implication. Respondents contended that they never prevented Petitioners from using the property, and if they did use it, it was with Respondents' permission. Respondents asserted that they "never granted [Petitioners] an easement nor did [Respondents] deny [Petitioners] use of the property. Why would we? They are family. The reality is that [Petitioners] used their own property to access their adjacent lot, not the property in question[.]" Respondents contended that there had never been an easement across the property, and while they planned to build a new residence of

their own on the New Property where the last one was located, this could not coexist with the Petitioners' claimed easement.

During the course of two hearings and a three-day bench trial, various witnesses testified regarding Petitioners' use of the alleged easement for ingress to and egress from the Old Property. Karen, Craig and Pearly Edwards, a former resident of the property, testified that numerous people routinely traversed Lots 84 through 87 (the New Property) by using the alleged easement for as long as they could remember. Conversely, Respondents testified that numerous people routinely accessed the Old Property with their vehicles either by White Street or Second Avenue. They testified that Mother and Father never accessed the old home place by crossing the New Property.

As to permission, Respondents testified that to the extent Michael drove across the New Property after he sold it to them in 1999, it was solely with their permission. When counsel asked David on cross-examination if there was ever any discussion with Michael about his use of the road, he stated:

A. He never come and asked me, no.

Q. He just used it?

A. Yes.

Q. And he never asked you?

A. No.

7

However, David also stated, "Even if he did come and discuss it with me, I didn't have no problem letting him use cause I know he had stuff to get move off there to get moved up to his own homeplace." Further, when asked if any of his brothers or family members ever used the property over his objection to go across his land to get to the back of the new home place, David responded, "no."

When Michael was asked whether he ever asserted any ownership interest in the road after he sold it, he responded,

> A.  I didn't have to assert it. He knowed that I would.
>
> Q.  He let you use it, right?
>
> A.  Well, yeah. Like I say, he never said that I couldn't.
>
>                    . . . .
>
> Q.  Did you ever ask your brother if he would temporarily allow you to use that?
>
> A.  No, sir.
>
> Q.  Why not?
>
> A.  Because he knowed when he bought the property that I was going to use it and continued to use it and never said a thing in the world about it.

During the trial, the circuit court conducted a site view of the properties.[8] While Petitioners alleged that they were landlocked, various maps and photographs were introduced into evidence demonstrating that the Old Property is bordered on the north by Second Avenue, a public road, which allows for vehicular access, and that there are stairs to allow for pedestrian access from the road to the land. And, these maps and photographs evidenced that the Old Property is bordered on the east by White Street, another public road, which allows for both vehicular and pedestrian access to the Old Property. The Petitioners' testimony repeatedly acknowledged that there were alternate routes of ingress to and egress from the Old Property. For example, the testimony in the record reveals that Petitioners and Mother and Father would drive a motor vehicle up to the edge of the patio of the new home place by way of a public road to unload groceries. As for pedestrian traffic, Karen testified that people used the stairs along the sloped terrain.

At the conclusion of the parties' evidence, the circuit court denied Petitioners' request for a permanent injunction finding that they did not have any easement on or over Respondents' property. Specifically, the court determined that (1) a prescriptive easement did not exist because Petitioners traversed the New Property for purposes of accessing the Old Property with Respondents' permission, and alternatively, even if Petitioners' use of the land was not permissible, it was not sufficiently open and notorious;

---

[8] However, the circuit court's order does not contain any reference to the site view.

9

(2) Petitioners did not have an easement by express grant or reservation; and (3) an implied easement did not exist because there was "no credible evidence of establishment of the easement by prior use or a showing of reasonable necessity, as opposed to establishment for convenience." This appeal followed.[9]

## II. STANDARD OF REVIEW

Regarding our standard of reviewing the refusal of a petition for permanent injunction, this Court has held:

> "'Unless an absolute right to injunctive relief is conferred by statute, the power to grant or refuse or to modify, continue, or dissolve a temporary or a permanent injunction, whether preventive or mandatory in character, ordinarily rests in the sound discretion of the trial court, according to the facts and the circumstances of the particular case; and its action in the exercise of its discretion will not be disturbed on appeal in the absence of a clear showing of an abuse of such discretion.' Syl. pt. 11, *Stuart v. Realty Corp.*, 141 W.Va. 627, 92 S.E.2d 891 (1956)." Syl. Pt. 1, *G Corp, Inc. v. MackJo, Inc.*, 195 W.Va. 752, 466 S.E.2d 820 (1995).[10]

Further, "[t]his Court reviews the circuit court's final order and ultimate disposition under an abuse of discretion standard. We review challenges to findings of fact under a clearly

---

[9] The court also dismissed Respondents' counterclaim finding no evidence that the use of "free water" for a number of years established a right to their perpetual use.

[10] Syl. Pt. 1, *Baisden v. W. Va. Secondary Schools Activities Comm.*, 211 W. Va. 725, 568 S.E.2d 32 (2002).

10

erroneous standard; conclusions of law are reviewed *de novo*."[11]  With these standards as guidance, this Court addresses Petitioners' assignments of error.

## III.  ANALYSIS

Petitioners assert several assignments of error that, distilled to their essence, present two issues for this Court to consider: (1) whether the circuit court abused its discretion when it found that Petitioners failed to prove an easement by prescription; and if not, alternatively, (2) whether the circuit court abused its discretion when it found that Petitioners failed to prove an implied easement by necessity or prior use.

### A.     *Prescriptive Easement*

Petitioners first challenge the circuit court's finding that they failed to prove an easement by prescription.  In syllabus point one of *O'Dell v. Stegall*,[12] this Court set forth the elements of a prescriptive easement:

> A person claiming a prescriptive easement must prove each of the following elements: (1) the adverse use of another's land; (2) that the adverse use was continuous and uninterrupted for at least ten years; (3) that the adverse use was actually known to the owner of the land, or so open, notorious and visible that a reasonable owner of the land would have noticed the use; and (4) the reasonably identified starting point, ending point, line, and width of the land that was adversely used, and the manner or purpose for which the land was adversely used.

---

[11] Syl. Pt. 1, *Wilson v. Staats*, 232 W. Va. 227, 751 S.E.2d 747 (2013) (quoting Syl. Pt. 4, *Burgess v. Porterfield*, 196 W.Va. 178, 469 S.E.2d 114 (1996)).

[12] 226 W. Va. 590, 703 S.E.2d 561 (2010).

11

Because easements by prescription "necessarily work losses or forfeitures of the rights of others," this Court has made it clear that "prescriptive easements are not favored in the law."[13] So, "[a] person claiming a prescriptive easement must establish each element of prescriptive use as a necessary and independent fact by clear and convincing evidence, and the failure to establish any one element is fatal to the claim."[14] "'[C]lear and convincing' is the measure or degree of proof that will produce in the mind of the factfinder a firm belief or conviction as to the allegations sought to be established."[15]

Petitioners contend that the testimony during trial neither supports the court's findings that Petitioners' use of the New Property was permissive, rather than adverse, for the requisite period, nor supports the finding that the use was not sufficiently open and notorious as the roadway/easement is in plain view of Respondents' home. Specifically, Petitioners allege that David's testimony is not credible in light of the allegedly untruthful and contradictory statements he made regarding the permissibility of Petitioners' use of the alleged easement. Petitioners contend that in their initial affidavit supporting their memorandum in opposition to the petition for injunctive relief, Respondents stated that "we never prevented the Petitioners from using the property and if he did use it, it was with

---

[13] *Id.* at 608–09, 703 S.E.2d at 579–80 (quoting *Zimmerman v. Newport*, 416 P.2d 622, 629 (Okl. 1966)).

[14] *Id.* at Syl. Pt. 3.

[15] *Id.* at 608, 703 S.E.2d at 579 (quoting *Brown v. Gobble*, 196 W. Va. 559, 564, 474 S.E.2d 489, 494 (1996)).

our permission." However, this was later contradicted by David. When asked by his counsel whether he let Michael and his other brother use the road crossing his property, David stated "I never did---I mean, they never come and ask me." When later asked if there was ever any discussion about the use of the road, David said, "He never come and asked me, no." Petitioners argue that in light of the supposed untruthfulness of Respondents' testimony and the obvious animosity between the parties, the Court should find there was no permission or familial accommodation granted by Respondents. Petitioners also take issue with the fact that Respondents denied the existence of any roadway across the New Property and allege that because of this, any use of the roadway must have been adverse.

Respondents counter that there is evidence in the record to support the court's factual finding that Petitioners traversed the New Property with the Respondents' permission to access the Old Property. Respondents contend they tacitly authorized the Petitioners to cross the New Property as a familial gesture because, given the family relations between the parties, it would have been "completely odd and out of character to affirmatively tell a sibling that they could cross your land." Respondents also maintain that Petitioners have not demonstrated that such permission was revoked more than ten years ago, so as to satisfy the statutory period needed for a prescriptive easement.

With respect to the element of adverse use, we stated in *O'Dell* that:

> [i]n the context of prescriptive easements, the term "adverse use" does not imply that the person claiming a prescriptive easement has animosity, personal hostility, or ill will toward the landowner; the uncommunicated mental state of the person is irrelevant. Instead, adverse use is measured by the observable actions and statements of the person claiming a prescriptive easement and the owner of the land.[16]

In defining adverse use, we also explained:

> [i]n the context of prescriptive easements, an "adverse use" of land is a wrongful use, made without the express *or implied permission* of the owner of the land. An "adverse use" is one that creates a cause of action by the owner against the person claiming the prescriptive easement; no prescriptive easement may be created unless the person claiming the easement proves that the owner could have prevented the wrongful use by resorting to the law.[17]

Further, "a use of another's land that began as permissive will not become adverse unless the license (created by the granting of permission) is repudiated."[18] And, "[t]he burden of proving adverse use is upon the party who is claiming a prescriptive easement against the interests of the true owner of the land."[19] "Whether the use is hostile or is merely a matter of neighborly accommodation . . . is a question of fact to be

---

[16] *Id.* at Syl. Pt. 4.

[17] *Id*. at Syl. Pt. 5. (emphasis added).

[18] *Id.* at Syl. Pt. 6, in part.

[19] *Id.* at Syl. Pt. 7, in part.

determined in light of the surrounding circumstances and the relationship between the parties."[20]

We explained in *O'Dell* that "[p]ermission may be inferred from the neighborly relation of the parties, or from other circumstances."[21] In examining what constitutes adverse use, we reasoned that even if the property owner has not given explicit permission, any use made in subordination to the property owner is not adverse.[22] We stated that "'subordination' means that the property owner is acting with authorization, express or implied, from the landowner, or acting under a right that is derivative from the landowner's title."[23] And, we noted that the reason that a use made in subordination to the property owner is not adverse

> . . . is that the property owner is not put on notice of the need to take steps to protect against the establishment of prescriptive rights. To express the idea that an adverse use cannot be in subordination to the rights of the owner, it is frequently said that the use must be made under claim of right. This does not mean that the user must claim entitlement to a servitude or show color of title, as sometimes mistakenly asserted,

---

[20] *Warsaw v. Chi. Metallic Ceilings*, Inc., 676 P.2d 584, 588 (Cal. 1984) (citations omitted).

[21] *O'Dell*, 226 W. Va. at 613, 703 S.E.2d at 584 (quoting 4 *Powell on Real Estate*, § 34.10[2][a]).

[22] *Id*. at 614, 703 S.E.2d at 585 (quoting *Restatement (Third) of Property (Servitudes)*, § 2.16, cmt. f)).

[23] *Id.*

15

> but merely that the user must not act in such a way as to lead the owner to believe that no adverse claim is asserted. Use under claim of right may also mean that the user acts as the owner of a servitude would act, as opposed to the way a casual trespasser would act.

*Restatement (Third) of Property (Servitudes)*, § 2.16, cmt. f.[24]

We also stated that "[u]ses 'made in subordination to the property owner' include uses by *someone closely related by blood*, a co-tenant, a licensee, or holder of some other type of easement or servitude. Because these uses are essentially authorized by the property owner, the use is not adverse."[25]

When we apply *O'Dell* to the facts in this case, we find no error in the circuit court's determination that Petitioners did not establish a prescriptive easement. In its findings of fact, the circuit court found that (1) Petitioners testified that "numerous persons routinely traversed Lots 84 through 87 by using the alleged easement for ingress and egress between Varney Street and the Old Property for as long as they could remember[;]" (2) Respondents testified that "numerous people routinely accessed the Old Property with their vehicles either by White Street or Second Avenue" and that "Mother and Father never accessed the old home by crossing the New Property[;]" and (3) Respondents also testified

---

[24] *Id. See also Restatement (Third) of Property (Servitudes)*, § 2.16 cmt. g (such implied permission "rests on the perceptions that Americans are both neighborly and litigious, so that an unauthorized use would have been objected to").

[25] *Id*. (footnote omitted) (emphasis added).

that "to the extent that [Michael] traversed the New Property after June 1999, it was solely with their permission. Michael testified that David 'knew when he bought my property that I used it. We had an agreement there.'"

The Circuit Court denied the Petitioners' prescriptive easement claim on two grounds: (1) the Petitioners' use was not adverse but rather permissive and, alternatively, (2) the Petitioners' use was not sufficiently open and notorious. Concluding that the first and third elements of a prescriptive easement had not been met, the court stated:

> to the extent that the Petitioners traversed the New Property for purposes of accessing the Old Property, the Petitioners did so with the Respondents' permission. Therefore [sic], even if the Petitioners' use of the Respondents' land was not permissible, because such use was not sufficiently open and notorious, the Petitioners' alleged prescriptive easement nevertheless fails.

While Petitioners assert that the circuit court improperly considered the alleged false testimony and sworn statements of Respondents regarding historical use of the easement, this Court has made it clear that a trial court's determinations regarding witness credibility are accorded great deference.[26] Although the circuit court's findings of

---

[26] *In re Faith C.*, 226 W. Va. 188, 195, 699 S.E.2d 730, 737 (2010) ("[W]hen findings are based on determinations regarding the credibility of witnesses, Rule 52(a) demands even greater deference to the trial court's findings. . . . Deference is appropriate because the trial judge was on the spot and is better able than an appellate court to decide whether the error affected substantial rights of the parties."); *State v. Guthrie*, 194 W. Va. 657, 669 n.9, 461 S.E.2d 163, 175 n.9 (1995) ("An appellate court may not decide the credibility of witnesses or weigh evidence as that is the exclusive function and task of the trier of fact. It is for the jury to decide which witnesses to believe or disbelieve. Once the

fact observe that "Michael testified that David 'knew when he bought my property that I used it. We had an agreement there[,]'" we are unable to locate this specific statement in the record. Nonetheless, when we observe the familial relationship of the parties coupled with Michael's testimony that David knew when he bought the property that Michael "was going to use it and continued to use it and never said a thing in the world about it," it is evident that implied permission existed. Because there is a reasonable basis in the record to find that the Petitioners crossed the Respondents' land with the Petitioners' implied permission, we cannot say that the circuit court abused its discretion in finding that Petitioners failed to establish a prescriptive easement.[27]

### B. *Implied Easement*

Petitioners alternatively assert that even if this Court determines that they had not established a prescriptive easement over the New Property, the circuit court erred in failing to conclude that they had proven that an implied easement existed.

---

jury has spoken, this Court may not review the credibility of the witnesses." (citation omitted)).

[27] Because we affirm the circuit court's ruling on this element and conclude that Petitioners failed to establish a prescriptive easement, we need not address their arguments regarding the remaining elements. *See O'Dell* at Syl. Pt. 3 ("the failure to establish any one element is fatal to the claim.").

### *(1)      Easement Implied by Necessity*

"There are two forms of implied easements: an easement implied by necessity (which in West Virginia is called a 'way of necessity'); and an easement implied by a prior use of the land (also called an easement implied from a 'quasi-easement')."[28] We have repeatedly stated that "[t]he law does not favor the creation of easements by implied grant or reservation."[29] So, "[c]ourts must be very careful before decreeing upon one man's land in favor of another without compensation such an encumbrance as a way, permanently impairing that man's dominion and ownership, which next to life and liberty, is the most valuable of rights inhering in the citizen."[30] With these concerns in mind, we have held that "[t]he burden of proving an easement rests on the party claiming such right and must be established by clear and convincing proof."[31]

As we explained in *Cobb v. Daugherty*,[32]

An easement implied by necessity arises when the owner of a unified tract of land severs the tract into two (or more) smaller

---

[28] Syl. Pt. 2, *Wilson v. Staats*, 232 W. Va. 227, 751 S.E.2d 747 (2013) (quoting Syl. Pt. 3, *Cobb v. Daugherty*, 225 W. Va. 435, 693 S.E.2d 800 (2010)).

[29] *Cobb* at Syl. Pt. 1 (quoting Syl. Pt. 1, *Stuart v. Lake Washington Realty*, 141 W.Va. 627, 92 S.E.2d 891 (1956)).

[30] *Wilson* at 231, 751 S.E.2d at 751 (quoting *Cobb*, 225 W. Va. at 442, 693 S.E.2d at 807).

[31] *Cobb at* Syl. Pt. 2 (quoting Syl. Pt. 1, *Berkeley Development Corp. v. Hutzler*, 159 W.Va. 844, 229 S.E.2d 732 (1976)).

[32] 225 W. Va. 435, 693 S.E.2d 800.

parcels, and then conveys one of those parcels that is of such a nature and extent that either the parcel conveyed or the parcel retained is landlocked, and either entirely surrounded by the land from which it is severed, or by this land and the land of strangers. Our law is clear that, in such cases, the owner of the landlocked parcel implicitly receives a right of way—a way of necessity—across the other tract of land.[33]

In *Cobb*, we articulated the following requirements for proving an easement by necessity:

> To establish an easement implied by necessity (which in West Virginia is called a "way of necessity"), a party must prove four elements: (1) prior common ownership of the dominant and servient estates; (2) severance (that is, a conveyance of the dominant and/or servient estates to another); (3) at the time of the severance, the easement was strictly necessary for the benefit of either the parcel transferred or the parcel retained; and (4) a continuing necessity for an easement.[34]

In observing that the last two elements of whether the easement was "strictly necessary" at the time of severance and whether the necessity continues to exist had produced confusion and uncertainty in our prior case law, we clarified this issue by holding that

> for a party to establish an easement implied by necessity (that is, to establish a way of necessity), the party must show that the easement across the servient estate is strictly necessary to the productive, beneficial, economical or physical use of the dominant estate. *Mere convenience, or even reasonable necessity are insufficient. If there is an alternate route, even if more difficult or more expensive to use, then no easement is*

---

[33]*Id*. at 443, 693 S.E.2d at 808.

[34] *Id.* at Syl. Pt. 4.

20

*implied by necessity. An easement by necessity is implied only where any other route would be practicably or economically impossible.*[35]

We stated that one reason courts have required parties to show an easement is implied by strict necessity is to prohibit "the imposition of a burden upon an estate for the mere convenience of another estate. Stated otherwise, it may be said that the necessity required is one of economical or physical use of the land and not merely an advantageous use of the land."[36] But, the more important reason that courts have required a showing of strict necessity for an easement is that, in many cases, "it is the grantor or seller of the disputed servient estate who is seeking to impose the easement, to the detriment of the grantee or buyer."[37] So, "a grantor should only rarely be allowed to derogate from his or her explicit deed and, by implication, take back from the grantee a way of ingress or egress."[38] And, "[i]f one has a reasonable outlet over his own property, he cannot exact a more convenient way as of necessity over the premises of another."[39]

---

[35] *Id.* at 446, 693 S.E.2d at 811 (emphasis added).

[36] *Id.* at 445, 693 S.E.2d at 810 (citing *Payne v. Edmonson*, 712 S.W.2d 793, 796 (Tex.App. 1986)).

[37] *Id.*

[38] *Id.*

[39] *Id.* at Syl. Pt. 5 (quoting Syl. Pt. 2, *Dorsey v. Dorsey*, 109 W.Va. 111, 153 S.E. 146 (1930)).

Petitioners contend that the conveyance of Lots 88–93 to Respondents in 2006, along with their purchase of the New Property in 1999, effectively landlocked Lots 127–129 from vehicular access, as the only possible vehicular access to Lots 127–129 is from First Street and/or Varney Street. Petitioners argue that prior to the 2006 conveyance of Lots 88–93, Mother still owned a means of access to Lots 127–129 from First Street through Lot 88, having allowed Respondents to construct a residence on Lots 89–91 and part of Lot 88. Petitioners admit that Mother never owned the New Property and "could not claim a right to an easement over said lots since she had an alternate means of access through the lots conveyed to [David] in 2006." Rather, they contend that after conveying Lots 88–93 to her son in 2006, Mother (and now her heirs) required an easement through those lots conveyed in 2006, in order to access the retained Lots 127–129 and use and enjoy them.[40]

---

[40] It is apparent from the briefing and the circuit court's order that both the Respondents and the circuit court may have confused the Petitioners' intention to seek an alternative implied easement across Lot 88, as both reference the New Property (Lots 84–87 and 130–133) when discussing the Petitioners' claim for an implied easement. In its order, the circuit court made the following factual finding: "In March 2015, the instant lawsuit ensued, wherein the Petitioners seek to establish an easement for vehicular ingress and egress *across the New Property* for the benefit of the Old Property, either by prescription *or implication*." (emphasis added). Because the New Property was never owned by Mother and Father, there was no unity of ownership of the dominant estate (the Old Property) and the servient estate (the New Property). *See Derifield v. Maynard*, 126 W. Va. 750, 754, 30 S.E.2d 10, 12 (1944). ("A way of necessity usually arises where there is a conveyance of a part of a tract of land of such nature and extent that either the part conveyed or the part retained is entirely surrounded by the land from which it is severed or by this land and the land of strangers.") So, Petitioners may only seek an implied easement by necessity over the lots previously owned by Mother and Father, Lots 88–93.

Petitioners assert that the testimony was that Craig Cantrell intended to construct a residence upon Lots 128–129. They argue that while Respondents assert that they could access Lots 127–129 (former location of the old home place) through the front yard of Lots 124–126 (location of the new home place), without an easement for access, the supplies and equipment necessary for construction cannot be moved there, as there is no means of access from Second Avenue (the area above Lots 128–129 is too steep and rocky for vehicle access) nor through the yard of Lots 124–127 from White Street (the septic systems are located on these lots, and there is no space available to relocate them).[41] Petitioners assert that the circuit court made no finding that Lots 128–129 could be accessed from Second Avenue or White Street, and that it was evident from the circuit court's site view that there was no access from either. Petitioners contend that all elements necessary to establish an easement by implication through reasonable necessity were proven by clear and convincing evidence, as the 2006 transfer of real property by Mother to David left her no means of vehicular access to Lots 127–129 and therefore no ability to construct a new residence upon the same (its intended purpose at purchase and prior use).

While the circuit court discussed the requisite legal standards for proving both an implied easement by "necessity," and an implied easement "by prior use," it did

Nonetheless, this has no bearing on the circuit court's determination that Petitioners failed to offer credible evidence that a reasonable necessity for any implied easement existed.

[41] Petitioners allege that the septic systems pre-existed the deed to Respondents of Lots 88–93 in 2006 and the construction of their residence in 1985.

23

not make any factual or legal conclusions regarding the specific issue of whether Petitioners established that an implied easement by necessity existed. The only finding the circuit court made regarding Petitioners' claim for implied easement was for that of "easement by prior use," where the circuit court summarily concluded that "[t]here has been no credible evidence of establishment of the easement by prior use or a showing of reasonable necessity, as opposed to establishment by [sic] for convenience."

Petitioners argue that, in denying that an implied easement existed, the court should have made findings "establishing that Petitioners have a means of access other than across the real property of the Respondents[.]" Conversely, Respondents argue that if the court were required to make a finding regarding alternative access, it implicitly did so by finding that there was no credible evidence of reasonable necessity. Although the circuit court's order lacks factual and legal findings on the issue of strict necessity, "[t]his Court has, on prior occasions, recognized that when we are able to resolve issues before the Court without a detailed order, it is not necessary to remand for the circuit court to provide

findings of fact and conclusions of law."[42]  We conclude that the record in this particular case is sufficient for purposes of appellate review.[43]

In this case, Petitioners have not proven that a strict necessity for the alleged implied easement exists.  The evidence indicates that the Old Property is bordered on the north by Second Avenue, a public road, which allows for vehicular access, and there are stairs to allow for pedestrian access from the road to the land.  And, the Old Property is bordered on the east by White Street, another public road, which allows for both vehicular and pedestrian access to the Old Property.  The Petitioners' testimony repeatedly acknowledged that there were alternate routes of ingress to and egress from the Old Property.  For example, there was testimony by multiple witnesses that Petitioners and Mother and Father would drive a motor vehicle up to the edge of the patio of the new home place by way of a public road in order to unload groceries.  As for pedestrian traffic, Karen testified that persons used stairs along the sloped terrain.  Although there was evidence

---

[42] *River Riders, Inc. v. Steptoe*, 223 W.Va. 240, 250, 672 S.E.2d 376, 386 (2009) (citing *Pruitt v. West Virginia Dept. of Public Safety*, 222 W.Va. 290, 295, 664 S.E.2d 175, 180 (2008) (this Court is able to resolve the issues before us without a detailed order and thus have no reason to remand for the circuit court to provide findings of fact and conclusions of law)); *Fayette County National Bank v. Lilly*, 199 W.Va. 349, 353–54, 484 S.E.2d 232, 236–37 (1997)) (same); *Toth v. Board of Parks and Recreation Com'rs*, 215 W.Va. 51, 55, 593 S.E.2d 576, 580 (2003) (same); *Ward v. Cliver*, 212 W.Va. 653, 656, 575 S.E.2d 263, 266 (2002) (same).

[43] Because the court found that petitioners failed to establish the lesser standard of reasonable necessity in assessing the issue of easement by prior use, for purposes of our review, we determine that the court implicitly determined that petitioners failed to establish the greater standard of strict necessity.

presented that the stairs are no longer in good repair, Respondents contend, and we agree, that the Petitioners' subsequent actions created and/or permitted this access point to be lost. It is well-established that "[t]he necessity on which the claimant relies cannot be self-created[.]"[44] Because Petitioners created their own hardship, any claim for an easement by necessity is precluded.[45]

More importantly, although Petitioners assert that the easement is necessary to build or construct a dwelling, our law clearly requires that a strict necessity must have existed "at the time of the severance."[46] So, the Petitioners' future plans to build a residence are irrelevant to a determination of whether a necessity existed when they inherited Lots 128–129. Further, regardless of the degree of necessity that is shown, our cases are clear that once the necessity ceases to exist, the way of necessity likewise ceases

---

[44] *See* Bruce & Ely, *The Law of Easements and Licenses in Land* § 4:22 (2019 ed.) (citing *O'Hara v. Chicago Title & Trust Co.*, 450 N.E.2d 1183, 1189–90 (Ill. App. Ct. 1983)).

[45] Further, Respondents correctly contend that although the Petitioners assert that the alternative means of access are too steep and rocky for vehicular access, "the fact that the existing way is steep or narrow, or can be made available only by the expenditure of money or labor, . . . has been held not to justify a finding of a way of necessity." 3 Tiffany Real Prop. § 794 (3d ed.) (footnotes omitted). *See Dorsey v. Dorsey*, 109 W. Va. 111, 112–13, 153 S.E. 146, 147 (1930) (holding that landowner failed to establish reasonable necessity where a tract of land bordered on a public road, but landowner's access to the public road was "precipitous" and owner sought to use a path across adjoining lot to haul timber on the basis that building his own access would entail expense.).

[46] *See Cobb* at Syl. Pt. 4 ("at the time of the severance, the easement was strictly necessary for the benefit of either the parcel transferred or the parcel retained").

to exist.[47]   Although Petitioners claim a necessity to access the site of the old home place

on Lots 128–129, any such necessity no longer exists because any necessity to access the

old home place ceased when it was razed.   Accordingly, Petitioners failed to establish an

implied easement by necessity.


### (2)   Easement Implied by Prior Use

Petitioners also contend that the circuit court erred in concluding that there

was no credible evidence to establish an implied easement by a showing of reasonable

necessity.[48]   Under West Virginia law:

> To establish an easement implied by a prior use of the land, a party
> must prove four elements: (1) prior common ownership of the dominant and
> servient estates; (2) severance (that is, a conveyance of the dominant and/or
> servient estates to another); (3) the use giving rise to the asserted easement
> was in existence at the time of the conveyance dividing the property, and the
> use has been so long continued and so obvious as to show that the parties to
> the conveyance intended and meant for the use to be permanent; and (4) the

---

[47] *See Berkeley Dev't Corp. v. Hutzler*, 159 W.Va. 844, 851, 229 S.E.2d 732, 736 (1976) ("A way of necessity having been created by implication for the benefit of the grantee of the dominant estate or his successors, thereafter, it cannot be extinguished so long as the necessity continues to exist.")

[48] Petitioners' fourth assignment of error mistakenly asserts that "the circuit court erred in concluding that there was no credible evidence to establish a *prescriptive* easement by a showing of reasonable necessity." (emphasis added).   Giving Petitioners the benefit of the doubt, we interpret this assignment of error to read that "the circuit court erred in concluding that there was no credible evidence to establish *an implied* easement by reasonable necessity."   So, we will discuss the circuit court's conclusion that there was "no credible evidence of establishment of the easement by prior use or a showing of reasonable necessity, as opposed to establishment by [sic] for convenience."

easement was necessary at the time of the severance for the proper and reasonable enjoyment of the dominant estate.[49]

Clearing up the meaning of the term "necessary" in our definitions of easements implied by prior use, we stated that "the requisite degree of necessity is 'reasonable necessity,' that is, the easement is 'necessary for the convenient and comfortable enjoyment of the property as it existed when the severance was made[.]'"[50] So, we held that

> [W]hen a party seeks to establish the existence of an easement implied by a prior use, the party must show the easement was not merely convenient to the enjoyment of the dominant estate, but (1) was important and reasonably necessary to the use of the dominant estate at the time the dominant and servient estates were severed; (2) that another access could not have been substituted at a reasonable expense; and (3) that without the easement there can be no other reasonable means of using the dominant estate.[51]

Here, Petitioners presented no clear and convincing evidence that there was an apparent and obvious pre-existing use of Lots 88–93. As discussed above, the Old Property is adjacent to public roads that allow for both vehicular and pedestrian access and there were stairs that allowed for pedestrian access along sloped terrain. Accordingly, we

---

[49] *Cobb* at Syl. Pt. 6.

[50] *Id*. at 448, 693 S.E.2d at 813 (citation omitted).

[51] *Id.* at 449, 693 S.E.2d at 814.

cannot state that the circuit court abused its discretion in determining that Petitioners failed to establish an implied easement by prior use.[52]

## C.       *Attorney's Fees*

Respondents assert that Petitioners' appeal is wholly without merit, especially in view of the applicable standard of review on appeal, and must be deemed vexatious, oppressive, and otherwise brought in bad faith.  So, Respondents urge this Court to order the Petitioners to pay the Respondents' costs and expenses incurred in this appeal, including, but not limited to, reasonable attorney's fees.[53]   We decline to find that Petitioners have acted in bad faith, vexatiously, wantonly or for oppressive reasons in the filing of this appeal.  So, Respondents' request for attorney's fees is denied.

---

[52] Petitioners make numerous contentions that the circuit court failed to mention and/or consider various pieces of evidence and testimony, including the site view it conducted of the property.  However, we accord these assertions scant merit.  The circuit court is under no obligation to discuss each and every piece of evidence presented at trial.  This Court has held that "if the record does not reveal an error, a court will conclude that one does not exist: 'It will be presumed, where the record is silent, that a court of competent jurisdiction performed its duty in all respects as required by law.'" *State ex rel. Kaufman v. Zakaib*, 207 W. Va. 662, 671, 535 S.E.2d 727, 736 (2000) ((citations omitted)).

[53] "As a general rule each litigant bears his or her own attorney's fees absent a contrary rule of court or express statutory or contractual authority for reimbursement." Syl. Pt. 1, *Corp. of Harpers Ferry v. Taylor*, 227 W. Va. 501, 711 S.E.2d 571 (2011) (quoting Syl. Pt. 2, *Sally-Mike Props. v. Yokum*, 179 W. Va. 48, 365 S.E.2d 246 (1986)). However, "[t]here is authority in equity to award to the prevailing litigant his or her reasonable attorney's fees as 'costs' without express statutory authorization, when the losing party has acted in bad faith, vexatiously, wantonly or for oppressive reasons." *Id*. at Syl. Pt. 2 (quoting *Sally-Mike Props*. at Syl. Pt. 3).

29

## IV. CONCLUSION

For these reasons, we affirm the circuit court's January 29, 2018 order refusing Petitioners' request for injunctive relief.

Affirmed.